## MUSCARELLO v. UNITED STATES

No. 96–1654.   Argued March 23, 1998—Decided June 8, 1998*

---

*Together with No. 96–8837, *Cleveland et al.* v. *United States,* on certiorari to the United States Court of Appeals for the First Circuit.

BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and SOUTER, JJ., joined, *post*, p. 139.

*Robert H. Klonoff* argued the cause for petitioner in No. 96–1654. With him on the briefs were *Gregory A. Castanias, Paul R. Reichert,* and *Ron S. Macaluso. Norman S. Zalkind,* by appointment of the Court, 522 U. S. 1074, argued the cause for petitioners in No. 96–8837. With him on the briefs were *Elizabeth A. Lunt, David Duncan,* and *John H. Cunha, Jr.,* by appointment of the Court, 522 U. S. 1074.

*James A. Feldman* argued the cause for the United States in both cases. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Keeney,* and *Deputy Solicitor General Dreeben.*†

JUSTICE BREYER delivered the opinion of the Court.

A provision in the firearms chapter of the federal criminal code imposes a 5-year mandatory prison term upon a person who "uses or carries a firearm" "during and in relation to" a "drug trafficking crime." 18 U. S. C. § 924(c)(1). The question before us is whether the phrase "carries a firearm" is limited to the carrying of firearms on the person. We hold that it is not so limited. Rather, it also applies to a person

†*Daniel Kanstroom, David Porter,* and *Kyle O'Dowd* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging reversal.

who knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies.

## I

The question arises in two cases, which we have consolidated for argument. Petitioner in the first case, Frank J. Muscarello, unlawfully sold marijuana, which he carried in his truck to the place of sale. Police officers found a handgun locked in the truck's glove compartment. During plea proceedings, Muscarello admitted that he had "carried" the gun "for protection in relation" to the drug offense, App. in No. 96–1654, p. 12, though he later claimed to the contrary, and added that, in any event, his "carr[ying]" of the gun in the glove compartment did not fall within the scope of the statutory word "carries." App. to Pet. for Cert. in No. 96–1654, p. 10a.

Petitioners in the second case, Donald Cleveland and Enrique Gray-Santana, placed several guns in a bag, put the bag in the trunk of a car, and then traveled by car to a proposed drug-sale point, where they intended to steal drugs from the sellers. Federal agents at the scene stopped them, searched the cars, found the guns and drugs, and arrested them.

In both cases the Courts of Appeals found that petitioners had "carrie[d]" the guns during and in relation to a drug trafficking offense. 106 F. 3d 636, 639 (CA5 1997); 106 F. 3d 1056, 1068 (CA1 1997). We granted certiorari to determine whether the fact that the guns were found in the locked glove compartment, or the trunk, of a car precludes application of § 924(c)(1). We conclude that it does not.

## II

### A

We begin with the statute's language. The parties vigorously contest the ordinary English meaning of the phrase

"carries a firearm." Because they essentially agree that Congress intended the phrase to convey its ordinary, and not some special legal, meaning, and because they argue the linguistic point at length, we too have looked into the matter in more than usual depth. Although the word "carry" has many different meanings, only two are relevant here. When one uses the word in the first, or primary, meaning, one can, as a matter of ordinary English, "carry firearms" in a wagon, car, truck, or other vehicle that one accompanies. When one uses the word in a different, rather special, way, to mean, for example, "bearing" or (in slang) "packing" (as in "packing a gun"), the matter is less clear. But, for reasons we shall set out below, we believe Congress intended to use the word in its primary sense and not in this latter, special way.

Consider first the word's primary meaning. The Oxford English Dictionary gives as its *first* definition "convey, originally by cart or wagon, hence in any vehicle, by ship, on horseback, etc." 2 Oxford English Dictionary 919 (2d ed. 1989); see also Webster's Third New International Dictionary 343 (1986) (*first* definition: "move while supporting (*as in a vehicle* or in one's hands or arms)"); Random House Dictionary of the English Language Unabridged 319 (2d ed. 1987) (*first* definition: "to take or support from one place to another; convey; transport").

The origin of the word "carries" explains why the first, or basic, meaning of the word "carry" includes conveyance in a vehicle. See Barnhart Dictionary of Etymology 146 (1988) (tracing the word from Latin "carum," which means "car" or "cart"); 2 Oxford English Dictionary, *supra*, at 919 (tracing the word from Old French "carier" and the late Latin "carricare," which meant to "convey in a car"); Oxford Dictionary of English Etymology 148 (C. Onions ed. 1966) (same); Barnhart Dictionary of Etymology, *supra*, at 143 (explaining that the term "car" has been used to refer to the automobile since 1896).

The greatest of writers have used the word with this meaning.  See, *e. g.*, The King James Bible, 2 Kings 9:28 ("[H]is servants carried him in a chariot to Jerusalem"); *id.*, Isaiah 30:6 ("[T]hey will carry their riches upon the shoulders of young asses").  Robinson Crusoe says, "[w]ith my boat, I carry'd away every Thing." D. Defoe, Robinson Crusoe 174 (J. Crowley ed. 1972).  And the owners of Queequeg's ship, Melville writes, "had lent him a [wheelbarrow], in which to carry his heavy chest to his boarding-house." H. Melville, Moby Dick 43 (U. Chicago 1952).  This Court, too, has spoken of the "carrying" of drugs in a car or in its "trunk." *California* v. *Acevedo*, 500 U. S. 565, 572–573 (1991); *Florida* v. *Jimeno*, 500 U. S. 248, 249 (1991).

These examples do not speak directly about carrying guns. But there is nothing linguistically special about the fact that weapons, rather than drugs, are being carried.  Robinson Crusoe might have carried a gun in his boat; Queequeg might have borrowed a wheelbarrow in which to carry not a chest but a harpoon.  And, to make certain that there is no special ordinary English restriction (unmentioned in dictionaries) upon the use of "carry" in respect to guns, we have surveyed modern press usage, albeit crudely, by searching computerized newspaper data bases—both the New York Times data base in Lexis/Nexis, and the "US News" data base in Westlaw.  We looked for sentences in which the words "carry," "vehicle," and "weapon" (or variations thereof) all appear. We found thousands of such sentences, and random sampling suggests that many, perhaps more than one-third, are sentences used to convey the meaning at issue here, *i. e.*, the carrying of guns in a car.

The New York Times, for example, writes about "an ex-con" who "arrives home driving a stolen car and carrying a load of handguns," Mar. 21, 1992, section 1, p. 18, col. 1, and an "official peace officer who carries a shotgun in his boat," June 19, 1988, section 12WC, p. 2, col. 1; cf. The New York

Times Manual of Style and Usage, a Desk Book of Guidelines for Writers and Editors, foreword (L. Jordan rev. ed. 1976) (restricting Times journalists and editors to the use of proper English). The Boston Globe refers to the arrest of a professional baseball player "for carrying a semiloaded automatic weapon in his car." Dec. 10, 1994, p. 75, col. 5. The Colorado Springs Gazette Telegraph speaks of one "Russell" who "carries a gun hidden in his car." May 2, 1993, p. B1, col. 2. The Arkansas Gazette refers to a "house" that was "searched" in an effort to find "items that could be carried in a car, such as . . . guns." Mar. 10, 1991, p. A1, col. 2. The San Diego Union-Tribune asks, "What, do they carry guns aboard these boats now?" Feb. 18, 1992, p. D2, col. 5.

Now consider a different, somewhat special meaning of the word "carry"—a meaning upon which the linguistic arguments of petitioners and the dissent must rest. The Oxford English Dictionary's *twenty-sixth* definition of "carry" is "bear, wear, hold up, or sustain, as one moves about; habitually to bear about with one." 2 Oxford English Dictionary, at 921. Webster's defines "carry" as "to move while supporting," not just in a vehicle, but also "in one's hands or arms." Webster's Third New International Dictionary, *supra*, at 343. And Black's Law Dictionary defines the entire phrase "carry arms or weapons" as

> "To wear, bear or carry them upon the person or in the clothing or in a pocket, for the purpose of use, or for the purpose of being armed and ready for offensive or defensive action in case of a conflict with another person." Black's Law Dictionary 214 (6th ed. 1990).

These special definitions, however, do not purport to *limit* the "carrying of arms" to the circumstances they describe. No one doubts that one who bears arms on his person "carries a weapon." But to say that is not to deny that one may *also* "carry a weapon" tied to the saddle of a horse or placed in a bag in a car.

Nor is there any linguistic reason to think that Congress intended to limit the word "carries" in the statute to any of these special definitions. To the contrary, all these special definitions embody a form of an important, but secondary, meaning of "carry," a meaning that suggests support rather than movement or transportation, as when, for example, a column "carries" the weight of an arch. 2 Oxford English Dictionary, at 919, 921. In this sense a gangster might "carry" a gun (in colloquial language, he might "pack a gun") even though he does not move from his chair. It is difficult to believe, however, that Congress intended to limit the statutory word to this definition—imposing special punishment upon the comatose gangster while ignoring drug lords who drive to a sale carrying an arsenal of weapons in their van.

We recognize, as the dissent emphasizes, that the word "carry" has other meanings as well. But those other meanings (e. g., "carry all he knew," "carries no colours"), see post, at 143–144, are not relevant here. And the fact that speakers often do *not* add to the phrase "carry a gun" the words "in a car" is of no greater relevance here than the fact that millions of Americans did *not* see Muscarello carry a gun in his truck. The relevant linguistic facts are that the word "carry" in its ordinary sense includes carrying in a car and that the word, used in its ordinary sense, keeps the same meaning whether one carries a gun, a suitcase, or a banana.

Given the ordinary meaning of the word "carry," it is not surprising to find that the Federal Courts of Appeals have unanimously concluded that "carry" is not limited to the carrying of weapons directly on the person but can include their carriage in a car. *United States* v. *Toms*, 136 F. 3d 176, 181 (CADC 1998); *United States* v. *Foster*, 133 F. 3d 704, 708 (CA9 1998); *United States* v. *Eyer*, 113 F. 3d 470, 476 (CA3 1997); 106 F. 3d, at 1066 (case below); 106 F. 3d, at 639 (case below); *United States* v. *Malcuit*, 104 F. 3d 880, 885, rehearing en banc granted, 116 F. 3d 163 (CA6 1997); *United States* v. *Mitchell*, 104 F. 3d 649, 653–654 (CA4 1997); *United*

States v. *Molina,* 102 F. 3d 928, 932 (CA7 1996); *United States* v. *Willis,* 89 F. 3d 1371, 1379 (CA8 1996); *United States* v. *Miller,* 84 F. 3d 1244, 1259–1260 (1996), overruled on other grounds, *United States* v. *Holland,* 116 F. 3d 1353 (CA10 1997); *United States* v. *Giraldo,* 80 F. 3d 667, 676–677 (CA2 1996); *United States* v. *Farris,* 77 F. 3d 391, 395–396 (CA11 1996).

## B

We now explore more deeply the purely legal question of whether Congress intended to use the word "carry" in its ordinary sense, or whether it intended to limit the scope of the phrase to instances in which a gun is carried "on the person." We conclude that neither the statute's basic purpose nor its legislative history support circumscribing the scope of the word "carry" by applying an "on the person" limitation.

This Court has described the statute's basic purpose broadly, as an effort to combat the "dangerous combination" of "drugs and guns." *Smith* v. *United States,* 508 U. S. 223, 240 (1993). And the provision's chief legislative sponsor has said that the provision seeks "to persuade the man who is tempted to commit a Federal felony to leave his gun at home." 114 Cong. Rec. 22231 (1968) (Rep. Poff); see *Busic* v. *United States,* 446 U. S. 398, 405 (1980) (describing Poff's comments as "crucial material" in interpreting the purpose of § 924(c)); *Simpson* v. *United States,* 435 U. S. 6, 13–14 (1978) (concluding that Poff's comments are "clearly probative" and "certainly entitled to weight"); see also 114 Cong. Rec. 22243–22244 (statutes would apply to "the man who goes out taking a gun to commit a crime") (Rep. Hunt); *id.,* at 22244 ("Of course, what we are trying to do by these penalties is to persuade the criminal to leave his gun at home") (Rep. Randall); *id.,* at 22236 ("We are concerned . . . with having the criminal leave his gun at home") (Rep. Meskill).

From the perspective of any such purpose (persuading a criminal "to leave his gun at home"), what sense would it

make for this statute to penalize one who walks with a gun in a bag to the site of a drug sale, but to ignore a similar individual who, like defendant Gray-Santana, travels to a similar site with a similar gun in a similar bag, but instead of walking, drives there with the gun in his car? How persuasive is a punishment that is without effect until a drug dealer who has brought his gun to a sale (indeed has it available for use) actually takes it from the trunk (or unlocks the glove compartment) of his car? It is difficult to say that, considered as a class, those who prepare, say, to sell drugs by placing guns in their cars are less dangerous, or less deserving of punishment, than those who carry handguns on their person.

We have found no significant indication elsewhere in the legislative history of any more narrowly focused relevant purpose. We have found an instance in which a legislator referred to the statute as applicable when an individual "has a firearm on his person," *ibid.* (Rep. Meskill); an instance in which a legislator speaks of "a criminal who takes a gun in his hand," *id.*, at 22239 (Rep. Pucinski); and a reference in the Senate Report to a "gun carried in a pocket," S. Rep. No. 98–225, p. 314, n. 10 (1983); see also 114 Cong. Rec. 21788, 21789 (1968) (references to gun "carrying" without more). But in these instances no one purports to define the scope of the term "carries"; and the examples of guns carried on the person are not used to illustrate the reach of the term "carries" but to illustrate, or to criticize, a different aspect of the statute.

Regardless, in other instances, legislators suggest that the word "carries" has a broader scope. One legislator indicates that the statute responds in part to the concerns of law enforcement personnel, who had urged that "carrying short firearms in motor vehicles be classified as carrying such weapons concealed." *Id.*, at 22242 (Rep. May). Another criticizes a version of the proposed statute by suggesting it might apply to drunken driving, and gives as an example a

drunken driver who has a "gun in his car." *Id.*, at 21792 (Rep. Yates). Others describe the statute as criminalizing gun "possession"—a term that could stretch beyond both the "use" of a gun and the carrying of a gun on the person. See *id.*, at 21793 (Rep. Casey); *id.*, at 22236 (Rep. Meskill); *id.*, at 30584 (Rep. Collier); *id.*, at 30585 (Rep. Skubitz).

## C

We are not convinced by petitioners' remaining arguments to the contrary. First, they say that our definition of "carry" makes it the equivalent of "transport." Yet, Congress elsewhere in related statutes used the word "transport" deliberately to signify a different, and broader, statutory coverage. The immediately preceding statutory subsection, for example, imposes a different set of penalties on one who, with an intent to commit a crime, "ships, transports, or receives a firearm" in interstate commerce. 18 U. S. C. § 924(b). Moreover, § 926A specifically "entitle[s]" a person "not otherwise prohibited . . . from transporting, shipping, or receiving a firearm" to "transport a firearm . . . from any place where he may lawfully possess and carry" it to "any other place" where he may do so. Why, petitioners ask, would Congress have used the word "transport," or used both "carry" and "transport" in the same provision, if it had intended to obliterate the distinction between the two?

The short answer is that our definition does not equate "carry" and "transport." "Carry" implies personal agency and some degree of possession, whereas "transport" does not have such a limited connotation and, in addition, implies the movement of goods in bulk over great distances. See Webster's Third New International Dictionary, at 343 (noting that "carry" means "moving to a location some distance away while supporting or maintaining off the ground" and "is a natural word to use in ref. to cargoes and loads on trucks, wagons, planes, ships, or even beasts of burden," while "transport refers to carriage in bulk or number over an ap-

preciable distance and, typically, by a customary or usual carrier agency"); see also Webster's Dictionary of Synonyms 141 (1942). If Smith, for example, calls a parcel delivery service, which sends a truck to Smith's house to pick up Smith's package and take it to Los Angeles, one might say that Smith has shipped the package and the parcel delivery service has transported the package. But only the truck driver has "carried" the package in the sense of "carry" that we believe Congress intended. Therefore, "transport" is a broader category that includes "carry" but also encompasses other activity.

The dissent refers to § 926A and to another statute where Congress used the word "transport" rather than "carry" to describe the movement of firearms. 18 U. S. C. § 925(a) (2)(B); *post,* at 146–147. According to the dissent, had Congress intended "carry" to have the meaning we give it, Congress would not have needed to use a different word in these provisions. But as we have discussed above, we believe the word "transport" is broader than the word "carry."

And, if Congress intended "carry" to have the limited definition the dissent contends, it would have been quite unnecessary to add the proviso in § 926A requiring a person, to be exempt from penalties, to store her firearm in a locked container not immediately accessible. See § 926A (quoted in full, *post,* at 146) (exempting from criminal penalties one who transports a firearm from a place where "he may lawfully possess and carry such firearm" but not exempting the "transportation" of a firearm if it is "readily accessible or is directly accessible from the passenger compartment of such transporting vehicle"). The statute simply could have said that such a person may not "carry" a firearm. But, of course, Congress did not say this because that is not what "carry" means.

As we interpret the statutory scheme, it makes sense. Congress has imposed a variable penalty with no mandatory minimum sentence upon a person who "transports" (or

"ships" or "receives") a firearm knowing it will be used to commit any "offense punishable by imprisonment for [more than] one year," § 924(b), and it has imposed a 5-year mandatory minimum sentence upon one who "carries" a firearm "during and in relation to" a "drug trafficking crime," § 924(c). The first subsection imposes a less strict sentencing regime upon one who, say, ships firearms by mail for use in a crime elsewhere; the latter subsection imposes a mandatory sentence upon one who, say, brings a weapon with him (on his person or in his car) to the site of a drug sale.

Second, petitioners point out that, in *Bailey* v. *United States*, 516 U. S. 137 (1995), we considered the related phrase "uses . . . a firearm" found in the same statutory provision now before us. See 18 U. S. C. § 924(c)(1) ("uses or carries a firearm"). We construed the term "use" narrowly, limiting its application to the "active employment" of a firearm. *Bailey*, 516 U. S., at 144. Petitioners argue that it would be anomalous to construe broadly the word "carries," its statutory next-door neighbor.

In *Bailey*, however, we limited "use" of a firearm to "active employment" in part because we assumed "that Congress . . . intended each term to have a particular, nonsuperfluous meaning." *Id.*, at 146. A broader interpretation of "use," we said, would have swallowed up the term "carry." *Ibid.* But "carry" as we interpret that word does not swallow up the term "use." "Use" retains the same independent meaning we found for it in *Bailey*, where we provided examples involving the displaying or the bartering of a gun. *Ibid.* "Carry" also retains an independent meaning, for, under *Bailey*, carrying a gun in a car does not necessarily involve the gun's "active employment." More importantly, having construed "use" narrowly in *Bailey*, we cannot also construe "carry" narrowly without undercutting the statute's basic objective. For the narrow interpretation would remove the act of carrying a gun in a car entirely from the statute's

reach, leaving a gap in coverage that we do not believe Congress intended.

Third, petitioners say that our reading of the statute would extend its coverage to passengers on buses, trains, or ships, who have placed a firearm, say, in checked luggage. To extend this statute so far, they argue, is unfair, going well beyond what Congress likely would have thought possible. They add that some lower courts, thinking approximately the same, have limited the scope of "carries" to instances where a gun in a car is immediately accessible, thereby most likely excluding from coverage a gun carried in a car's trunk or locked glove compartment. See, *e. g., Foster*, 133 F. 3d, at 708 (concluding that person "carries" a firearm in a car only if the firearm is immediately accessible); *Giraldo*, 80 F. 3d, at 676 (same).

In our view, this argument does not take adequate account of other limiting words in the statute—words that make the statute applicable only where a defendant "carries" a gun *both* "during *and* in relation to" a drug crime. § 924(c)(1) (emphasis added). Congress added these words in part to prevent prosecution where guns "played" no part in the crime. See S. Rep. No. 98–225, at 314, n. 10; cf. *United States* v. *Stewart*, 779 F. 2d 538, 539 (CA9 1985) (Kennedy, J.) (observing that " 'in relation to' " was "added to allay explicitly the concern that a person could be prosecuted . . . for committing an entirely unrelated crime while in possession of a firearm"), overruled in part on other grounds, *United States* v. *Hernandez*, 80 F. 3d 1253, 1257 (CA9 1996).

Once one takes account of the words "during" and "in relation to," it no longer seems beyond Congress' likely intent, or otherwise unfair, to interpret the statute as we have done. If one carries a gun in a car "during" and "in relation to" a drug sale, for example, the fact that the gun is carried in the car's trunk or locked glove compartment seems not only logically difficult to distinguish from the immediately accessible gun, but also beside the point.

At the same time, the narrow interpretation creates its own anomalies. The statute, for example, defines "firearm" to include a "bomb," "grenade," "rocket having a propellant charge of more than four ounces," or "missile having an explosive or incendiary charge of more than one-quarter ounce," where such device is "explosive," "incendiary," or delivers "poison gas." 18 U. S. C. § 921(a)(4)(A). On petitioners' reading, the "carry" provision would not apply to instances where drug lords, engaged in a major transaction, took with them "firearms" such as these, which most likely could not be carried on the person.

Fourth, petitioners argue that we should construe the word "carry" to mean "immediately accessible." And, as we have said, they point out that several Courts of Appeals have limited the statute's scope in this way. See, e. g., Foster, supra, at 708; Giraldo, supra, at 676. That interpretation, however, is difficult to square with the statute's language, for one "carries" a gun in the glove compartment whether or not that glove compartment is locked. Nothing in the statute's history suggests that Congress intended that limitation. And, for reasons pointed out above, see supra, at 137, we believe that the words "during" and "in relation to" will limit the statute's application to the harms that Congress foresaw.

Finally, petitioners and the dissent invoke the "rule of lenity." The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree. Cf. Smith, 508 U. S., at 239 ("The mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable"). " 'The rule of lenity applies only if, "after seizing everything from which aid can be derived," . . . we can make "no more than a guess as to what Congress intended." ' " United States v. Wells, 519 U. S. 482, 499 (1997) (quoting Reno v. Koray, 515 U. S. 50, 65 (1995), in turn quoting Smith, supra, at 239, and Ladner v. United States, 358 U. S. 169, 178 (1958)). To invoke the rule, we must con-

clude that there is a "'"grievous ambiguity or uncertainty"'" in the statute." *Staples* v. *United States,* 511 U. S. 600, 619, n. 17 (1994) (quoting *Chapman* v. *United States,* 500 U. S. 453, 463 (1991)). Certainly, our decision today is based on much more than a "guess as to what Congress intended," and there is no "grievous ambiguity" here. The problem of statutory interpretation in these cases is indeed no different from that in many of the criminal cases that confront us. Yet, this Court has never held that the rule of lenity automatically permits a defendant to win.

In sum, the "generally accepted contemporary meaning" of the word "carry" includes the carrying of a firearm in a vehicle. The purpose of this statute warrants its application in such circumstances. The limiting phrase "during and in relation to" should prevent misuse of the statute to penalize those whose conduct does not create the risks of harm at which the statute aims.

For these reasons, we conclude that petitioners' conduct falls within the scope of the phrase "carries a firearm." The judgments of the Courts of Appeals are affirmed.

*It is so ordered.*

JUSTICE GINSBURG, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE SOUTER join, dissenting.

Section 924(c)(1) of Title 18, United States Code, is a punishment-enhancing provision; it imposes a mandatory five-year prison term when the defendant "during and in relation to any crime of violence or drug trafficking . . . uses or carries a firearm." In *Bailey* v. *United States,* 516 U. S. 137 (1995), this Court held that the term "uses," in the context of § 924(c)(1), means "active employment" of the firearm. In today's cases we confront a related question: What does the term "carries" mean in the context of § 924(c)(1), the enhanced punishment prescription again at issue.

It is uncontested that § 924(c)(1) applies when the defendant bears a firearm, *i. e.,* carries the weapon on or about his

person "for the purpose of being armed and ready for offensive or defensive action in case of a conflict." Black's Law Dictionary 214 (6th ed. 1990) (defining the phrase "carry arms or weapons"); see *ante*, at 130. The Court holds that, in addition, "carries a firearm," in the context of § 924(c)(1), means personally transporting, possessing, or keeping a firearm in a vehicle, anyplace in a vehicle.

Without doubt, "carries" is a word of many meanings, definable to mean or include carting about in a vehicle. But that encompassing definition is not a ubiquitously necessary one. Nor, in my judgment, is it a proper construction of "carries" as the term appears in § 924(c)(1). In line with *Bailey* and the principle of lenity the Court has long followed, I would confine "carries a firearm," for § 924(c)(1) purposes, to the undoubted meaning of that expression in the relevant context. I would read the words to indicate not merely keeping arms on one's premises or in one's vehicle, but bearing them in such manner as to be ready for use as a weapon.

## I

### A

I note first what is at stake for petitioners. The question before the Court "is not *whether* possession of a gun [on the drug offender's premises or in his car, during and in relation to commission of the offense,] means a longer sentence for a convicted drug dealer. It most certainly does. . . . Rather, the question concerns *which sentencing statute* governs the precise length of the extra term of punishment," § 924(c)(1)'s "blunt 'mandatory minimum'" five-year sentence, or the more finely tuned "sentencing guideline statutes, under which extra punishment for drug-related gun possession varies with the seriousness of the drug crime." *United States* v. *McFadden*, 13 F. 3d 463, 466 (CA1 1994) (Breyer, C. J., dissenting).

Accordingly, there would be no "gap," see *ante*, at 137, no relevant conduct "ignore[d]," see *ante*, at 133, were the Court to reject the Government's broad reading of § 924(c)(1). To

be more specific, as cogently explained on another day by today's opinion writer:

> "The special 'mandatory minimum' sentencing statute says that anyone who *'uses or carries'* a gun 'during and in relation to any . . . drug trafficking crime' must receive a mandatory five-year prison term added on to his drug crime sentence. 18 U. S. C. § 924(c). At the same time, the Sentencing Guidelines, promulgated under the authority of a different statute, 28 U. S. C. § 994, provide for a two-level (i. e., a 30% to 40%) sentence enhancement where a 'firearm . . . was possessed' by a drug offender, U. S. S. G. § 2D1.1(b)(1), unless the possession clearly was not 'connected with the [drug] offense.'" *McFadden,* 13 F. 3d, at 467 (Breyer, C. J., dissenting).

In Muscarello's case, for example, the underlying drug crimes involved the distribution of 3.6 kilograms of marijuana, and therefore carried a base offense level of 12. See United States Sentencing Commission, Guidelines Manual § 2D1.1(a)(3) (Nov. 1995). After adjusting for Muscarello's acceptance of responsibility, see *id.,* § 3E1.1(a), his final offense level was 10, placing him in the 6-to-12 month sentencing range. See *id.,* ch. 5, pt. A. The two-level enhancement for possessing a firearm, *id.,* § 2D1.1(b)(1), would have increased his final offense level to 12 (a sentencing range of 10 to 16 months). In other words, the less rigid (tailored to "the seriousness of the drug crime," *McFadden,* 13 F. 3d, at 466) Guidelines regime would have added four months to Muscarello's prison time, in contrast to the five-year minimum addition the Court's reading of § 924(c)(1) mandates.[1]

---

[1] The Sentencing Guidelines carry out "a major congressional effort to create a fairly sophisticated . . . system that distinguishes among different kinds of criminal behavior and punishes accordingly." *United States* v. *McFadden,* 13 F. 3d, at 467–468 (Breyer, C. J., dissenting). A "mandatory minimum" statute deviates from the general regime Congress installed. "Given the importance (to Congress) of the Guidelines system, . . . courts should take care not to interpret [with unnecessary breadth] . . . deviations

142

In sum, drug traffickers will receive significantly longer sentences if they are caught traveling in vehicles in which they have placed firearms. The question that divides the Court concerns the proper reference for enhancement in the cases at hand, the Guidelines or § 924(c)(1).

## B

Unlike the Court, I do not think dictionaries,[2] surveys of press reports,[3] or the Bible[4] tell us, dispositively, what "car-

from the basic congressionally-directed effort to rationalize sentencing." *Id.*, at 468.

[2] I note, however, that the only legal dictionary the Court cites, Black's Law Dictionary, defines "carry arms or weapons" restrictively. See *ante*, at 130; *supra*, at 139–140.

[3] Many newspapers, the New York Times among them, have published stories using "transport," rather than "carry," to describe gun placements resembling petitioners'. See, *e. g.*, Atlanta Constitution, Feb. 27, 1998, p. 9D, col. 2 ("House members last week expanded gun laws by allowing weapons to be *carried into restaurants or transported anywhere in cars.*"); Chicago Tribune, June 12, 1997, sports section, p. 13 ("Disabled hunters with permission to hunt from a standing vehicle would be able to *transport a shotgun in an all-terrain vehicle* as long as the gun is unloaded and the breech is open."); Colorado Springs Gazette Telegraph, Aug. 4, 1996, p. C10 (British gun laws require "locked steel cases bolted onto a car for *transporting guns from home to shooting range.*"); Detroit News, Oct. 26, 1997, p. D14 ("It is unlawful to *carry afield or transport a rifle* . . . or shotgun if you have buckshot, slug, ball loads, or cut shells in possession except while traveling directly to deer camp or target range with firearm not readily available to vehicle occupants."); N. Y. Times, July 4, 1993, p. A21, col. 2 ("[T]he gun is supposed to be *transported unloaded,* in a locked box in the trunk."); Santa Rosa Press Democrat, Sept. 28, 1996, p. B1 ("Police and volunteers ask that participants . . . *transport [their guns] to the fairgrounds* in the trunks of their cars."); Worcester Telegram & Gazette, July 16, 1996, p. B3 ("Only one gun can be turned in per person. *Guns transported in a vehicle* should be locked in the trunk.") (emphasis added in all quotations).

[4] The translator of the Good Book, it appears, bore responsibility for determining whether the servants of Ahaziah "carried" his corpse to Jerusalem. Compare *ante*, at 129, with, *e. g.*, The New English Bible, 2 Kings 9:28 ("His servants *conveyed* his body to Jerusalem."); Saint Joseph Edi-

ries" means embedded in § 924(c)(1). On definitions, "carry" in legal formulations could mean, *inter alia,* transport, possess, have in stock, prolong (carry over), be infectious, or wear or bear on one's person.[5] At issue here is not "carries" at large but "carries a firearm." The Court's computer search of newspapers is revealing in this light. Carrying guns in a car showed up as the meaning "perhaps more than one-third" of the time. *Ante,* at 129. One is left to wonder what meaning showed up some two-thirds of the time. Surely a most familiar meaning is, as the Constitution's Second Amendment ("keep and *bear* Arms") (emphasis added) and Black's Law Dictionary, at 214, indicate: "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."

On lessons from literature, a scan of Bartlett's and other quotation collections shows how highly selective the Court's choices are. See *ante,* at 129. If "[t]he greatest of writers" have used "carry" to mean convey or transport in a vehicle, so have they used the hydra-headed word to mean, *inter alia,* carry in one's hand, arms, head, heart, or soul, sans vehicle. Consider, among countless examples:

> "[H]e shall gather the lambs with his arm, and carry them in his bosom." The King James Bible, Isaiah 40:11.

> "And still they gaz'd, and still the wonder grew,

---

tion of the New American Bible ("His servants *brought* him in a chariot to Jerusalem."); Tanakh: The Holy Scriptures ("His servants *conveyed* him in a chariot to Jerusalem."); see also *id.,* Isaiah 30:6 ("They *convey* their wealth on the backs of asses."); The New Jerusalem Bible ("[T]hey *bear* their riches on donkeys' backs.") (emphasis added in all quotations).

[5] The dictionary to which this Court referred in *Bailey* v. *United States,* 516 U. S. 137, 145 (1995), contains 32 discrete definitions of "carry," including "[t]o make good or valid," "to bear the aspect of," and even "[t]o bear (a hawk) on the fist." See Webster's New International Dictionary 412 (2d ed. 1949).

144

That one small head could carry all he knew."
O. Goldsmith, The Deserted Village, ll. 215–216, in The Poetical Works of Oliver Goldsmith 30 (A. Dobson ed. 1949).

"There's a Legion that never was 'listed,
That carries no colours or crest."
R. Kipling, The Lost Legion, st. 1, in Rudyard Kipling's Verse, 1885–1918, p. 222 (1920).

"There is a homely adage which runs, 'Speak softly and carry a big stick; you will go far.'" T. Roosevelt, Speech at Minnesota State Fair, Sept. 2, 1901, in J. Bartlett, Familiar Quotations 575:16 (J. Kaplan ed. 1992).[6]

These and the Court's lexicological sources demonstrate vividly that "carry" is a word commonly used to convey various messages. Such references, given their variety, are not reliable indicators of what Congress meant, in § 924(c)(1), by "carries a firearm."

C

Noting the paradoxical statement, "'I *use* a gun to protect my house, but I've never had to *use* it,'" the Court in *Bailey*, 516 U. S., at 143, emphasized the importance of context—the statutory context. Just as "uses" was read to mean not simply "possession," but "active employment," so "carries," correspondingly, is properly read to signal the most danger-

---

[6] Popular films and television productions provide corroborative illustrations. In "The Magnificent Seven," for example, O'Reilly (played by Charles Bronson) says: "You think I am brave because I carry a gun; well, your fathers are much braver because they carry responsibility, for you, your brothers, your sisters, and your mothers." See http://us.imdb.com/M/search_quotes?for=carry. And in the television series "M*A*S*H," Hawkeye Pierce (played by Alan Alda) presciently proclaims: "I will not carry a gun. . . . I'll carry your books, I'll carry a torch, I'll carry a tune, I'll carry on, carry over, carry forward, Cary Grant, cash and carry, carry me back to Old Virginia, I'll even 'hari-kari' if you show me how, but I will not carry a gun!" See http://www.geocities.com/Hollywood/8915/mashquotes.html.

ous cases—the gun at hand, ready for use as a weapon.[7] It is reasonable to comprehend Congress as having provided mandatory minimums for the most life-jeopardizing gun-connection cases (guns in or at the defendant's hand when committing an offense), leaving other, less imminently threatening, situations for the more flexible Guidelines regime.[8] As the Ninth Circuit suggested, it is not apparent why possession of a gun in a drug dealer's moving vehicle would be thought more dangerous than gun possession on premises where drugs are sold: "A drug dealer who packs heat is more likely to hurt someone or provoke someone else to violence. A gun in a bag under a tarp in a truck bed [or in a bedroom closet] poses substantially less risk." *United States* v. *Foster*, 133 F. 3d 704, 707 (1998) (en banc).[9]

For indicators from Congress itself, it is appropriate to consider word usage in other provisions of Title 18's chapter on "Firearms." See *Bailey*, 516 U. S., at 143, 146 (interpreting § 924(c)(1) in light of 18 U. S. C. §§ 922(g), 922(j), 922(k), 922(o)(1), 924(d)(1), 930(a), 930(b)). The Court, however,

---

[7] In my view, the Government would carry its burden by proving a firearm was kept so close to the person as to approximate placement in a pocket or holster, *e. g.*, guns carried at one's side in a briefcase or handbag, or strapped to the saddle of a horse. See *ante*, at 130.

[8] The Court reports that the Courts of Appeals "have unanimously concluded that 'carry' is not limited to the carrying of weapons directly on the person." *Ante*, at 131. In *Bailey*, however, the Government's argument based on a similar observation did not carry the day. See Brief for United States in *Bailey* v. *United States*, O. T. 1995, Nos. 94–7448 and 94–7492, p. 16, n. 4. No Court of Appeals had previously adopted an "active employment" construction of "uses . . . a firearm" in § 924(c)(1), yet this Court did exactly that. See 516 U. S., at 144.

[9] The "Firearms" statutes indicate that Congress, unlike the Court, *ante*, at 132–133, recognizes that a gun in the hand is indeed more dangerous than a gun in the trunk. See, *e. g.*, 18 U. S. C. § 926A (permitting the transportation of firearms in a vehicle, but only if "neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle"); see *infra*, at 146–147.

does not derive from the statutory complex at issue its thesis that "'[c]arry' implies personal agency and some degree of possession, whereas 'transport' does not have such a limited connotation and, in addition, implies the movement of goods in bulk over great distances." *Ante,* at 134. Looking to provisions Congress enacted, one finds that the Legislature did not acknowledge or routinely adhere to the distinction the Court advances today; instead, Congress sometimes employed "transports" when, according to the Court, "carries" was the right word to use.

Section 925(a)(2)(B), for example, provides that no criminal sanction shall attend "the transportation of [a] firearm or ammunition carried out to enable a person, who lawfully received such firearm or ammunition from the Secretary of the Army, to engage in military training or in competitions." The full text of § 926A, rather than the truncated version the Court presents, see *ibid.,* is also telling:

> "Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided,* That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console."

In describing when and how a person may travel in a vehicle that contains his firearm without violating the law,

§§ 925(a)(2)(B) and 926A use "transport," not "carry," to "impl[y] personal agency and some degree of possession." *Ibid.*[10]

Reading "carries" in § 924(c)(1) to mean "on or about [one's] person" is fully compatible with these and other "Firearms" statutes.[11] For example, under § 925(a)(2)(B), one could carry his gun to a car, transport it to the shooting competition, and use it to shoot targets. Under the conditions of § 926A, one could transport her gun in a car, but under no circumstances could the gun be readily accessible while she travels in the car. "[C]ourts normally try to read language in different, but related, statutes, so as best to reconcile

---

[10] The Court asserts that "'transport' is a broader category that includes 'carry' but also encompasses other activity." *Ante,* at 135. "Carry," however, is not merely a subset of "transport." A person seated at a desk with a gun in hand or pocket is carrying the gun, but is not transporting it. Yes, the words "carry" and "transport" often can be employed interchangeably, as can the words "carry" and "use." But in *Bailey,* this Court settled on constructions that gave "carry" and "use" independent meanings. See 516 U. S., at 145–146. Without doubt, Congress is alert to the discrete meanings of "transport" and "carry" in the context of vehicles, as the Legislature's placement of each word in § 926A illustrates. The narrower reading of "carry" preserves discrete meanings for the two words, while in the context of vehicles the Court's interpretation of "carry" is altogether synonymous with "transport." Tellingly, when referring to firearms traveling in vehicles, the "Firearms" statutes routinely use a form of "transport"; they never use a form of "carry."

[11] See *infra,* at 149, nn. 13, 14. The Government points to numerous federal statutes that authorize law enforcement officers to "carry firearms" and notes that, in those authorizing provisions, "carry" of course means "both on the person and in a vehicle." Brief for United States 31–32, and n. 18. Quite right. But as viewers of "Sesame Street" will quickly recognize, "one of these things [a statute *authorizing* conduct] is not like the other [a statute *criminalizing* conduct]." The authorizing statutes in question are properly accorded a construction compatible with the clear purpose of the legislation to aid federal law enforcers in the performance of their official duties. It is fundamental, however, that a penal statute is not to be construed generously in the Government's favor. See, *e. g., United States* v. *Bass,* 404 U. S. 336, 348 (1971).

those statutes, in light of their purposes and of common sense." *McFadden*, 13 F. 3d, at 467 (Breyer, C. J., dissenting). So reading the "Firearms" statutes, I would not extend the word "carries" in § 924(c)(1) to mean transports out of hand's reach in a vehicle.[12]

## II

Section 924(c)(1), as the foregoing discussion details, is not decisively clear one way or another. The sharp division in the Court on the proper reading of the measure confirms, "[a]t the very least, . . . that the issue is subject to some doubt. Under these circumstances, we adhere to the familiar rule that, 'where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.'" *Adamo Wrecking Co.* v. *United States*, 434 U. S. 275, 284–285 (1978) (citation omitted); see *United States* v. *Granderson*, 511 U. S. 39, 54 (1994) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor."). "Carry" bears many mean-

---

[12] The Court places undue reliance on Representative Poff's statement that § 924(c)(1) seeks "'to persuade the man who is tempted to commit a Federal felony to leave his gun at home.'" *Ante*, at 132 (quoting 114 Cong. Rec. 22231 (1968)). As the Government argued in its brief to this Court in *Bailey:*

"In making that statement, Representative Poff was not referring to the 'carries' prong of the original Section 924(c). As originally enacted, the 'carries' prong of the statute prohibited only the 'unlawful' carrying of a firearm while committing an offense. The statute would thus not have applied to an individual who, for instance, had a permit for carrying a gun and carried it with him when committing an offense, and it would have had no force in 'persuading' such an individual 'to leave his gun at home.' Instead, Representative Poff was referring to the 'uses' prong of the original Section 924(c)." Brief for United States in *Bailey* v. *United States*, O. T. 1995, Nos. 94–7448 and 94–7492, p. 28.

Representative Poff's next sentence confirms that he was speaking of "uses," not "carries": "Any person should understand that if he *uses* his gun and is caught and convicted, he is going to jail." 114 Cong. Rec., at 22231 (emphasis added).

ings, as the Court and the "Firearms" statutes demonstrate.[13] The narrower "on or about [one's] person" interpretation is hardly implausible nor at odds with an accepted meaning of "carries a firearm."

Overlooking that there will be an enhanced sentence for the gun-possessing drug dealer in any event, see *supra*, at 140–142, the Court asks rhetorically: "How persuasive is a punishment that is without effect until a drug dealer who has brought his gun to a sale (indeed has it available for use) actually takes it from the trunk (or unlocks the glove compartment) of his car?" *Ante*, at 133. Correspondingly, the Court defines "carries a firearm" to cover "a person who knowingly possesses and conveys firearms [anyplace] in a vehicle . . . which the person accompanies." *Ante*, at 126–127. Congress, however, hardly lacks competence to select the words "possesses" or "conveys" when that is what the Legislature means.[14] Notably in view of the Legislature's capacity to speak plainly, and of overriding concern, the Court's inquiry

---

[13] Any doubt on that score is dispelled by examining the provisions in the "Firearms" chapter, in addition to § 924(c)(1), that include a form of the word "carry": 18 U. S. C. § 922(a)(5) ("*carry out* a bequest"); §§ 922(s)(6)(B)(ii), (iii) ("*carry out* this subsection"); § 922(u) ("*carry away* [a firearm]"); 18 U. S. C. § 924(a)(6)(B)(ii) (1994 ed., Supp. II) ("*carry* or otherwise possess or discharge or otherwise use [a] handgun"); 18 U. S. C. § 924(e)(2)(B) ("*carrying* of a firearm"); § 925(a)(2) ("*carried out* to enable a person"); § 926(a) ("*carry out* the provisions of this chapter"); § 926A ("lawfully possess and *carry* such firearm to any other place where he may lawfully possess and *carry* such firearm"); § 929(a)(1) ("uses or *carries* a firearm and is in possession of armor piercing ammunition"); § 930(d)(3) ("lawful *carrying* of firearms . . . in a Federal facility incident to hunting or other lawful purposes") (emphasis added in all quotations).

[14] See, *e. g.*, 18 U. S. C. § 924(a)(6)(B)(ii) (1994 ed., Supp. II) ("if the person sold . . . a handgun . . . to a juvenile knowing . . . that the juvenile intended to *carry or otherwise possess* . . . the handgun . . . in the commission of a crime of violence"); 18 U. S. C. § 926A ("may lawfully *possess and carry* such firearm to any other place where he may lawfully *possess and carry* such firearm"); § 929(a)(1) ("uses or *carries a firearm and is in possession* of armor piercing ammunition"); § 2277 ("brings, *carries, or possesses* any dangerous weapon") (emphasis added in all quotations).

pays scant attention to a core reason for the rule of lenity: "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies 'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.'" *United States* v. *Bass*, 404 U. S. 336, 348 (1971) (quoting H. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 209 (1967)).

\* \* \*

The narrower "on or about [one's] person" construction of "carries a firearm" is consistent with the Court's construction of "uses" in *Bailey* to entail an immediacy element. It respects the Guidelines system by resisting overbroad readings of statutes that deviate from that system. See *McFadden*, 13 F. 3d, at 468 (Breyer, C. J., dissenting). It fits plausibly with other provisions of the "Firearms" chapter, and it adheres to the principle that, given two readings of a penal provision, both consistent with the statutory text, we do not choose the harsher construction. The Court, in my view, should leave it to Congress to speak "'in language that is clear and definite'" if the Legislature wishes to impose the sterner penalty. *Bass*, 404 U. S., at 347 (quoting *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 222 (1952)). Accordingly, I would reverse the judgments of the First and Fifth Circuits.