**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-4169**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CARLISA RENEA ALLEN,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:23-cr-00124-WO-2)

_____

Argued:  May 15, 2025                    Decided:  August 13, 2025

_____

Before DIAZ, Chief Judge, and NIEMEYER and BERNER, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Niemeyer wrote the opinion, in which Chief Judge Diaz and Judge Berner joined.

_____

**ARGUED:**  Craig Mitchell Cooley, COOLEY LAW OFFICE, Cary, North Carolina, for Appellant.  Tracy Maria Williams-Durham, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Sandra J. Hairston, United States Attorney, Michael A. DeFranco, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

A jury found that Carlisa Allen and her boyfriend, Cye Frasier, conspired to distribute cocaine and fentanyl in Durham and Orange Counties, North Carolina, from January 2021 to March 15, 2023, targeting mainly students at Duke University and the University of North Carolina at Chapel Hill, and that as a result of their distribution, Joshua Zinner died from the ingestion of cocaine and fentanyl. It also found that Allen distributed cocaine on February 23, 2023; that she possessed with the intent to distribute both cocaine and fentanyl on March 15, 2023; and that she possessed a firearm in furtherance of her March 15 drug offenses. The jury convicted her on five counts for violations of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C); 18 U.S.C. § 924(c)(1)(A)(i); and 18 U.S.C. § 2, and the district court sentenced her to 336 months' imprisonment.

On appeal, Allen challenges the sufficiency of the evidence offered to prove (1) that she possessed with the intent to distribute the cocaine and fentanyl that was contained in a bookbag seized from her car on March 15; (2) that her possession of the firearm seized from her car on March 15 was in furtherance of a drug offense; and (3) that Joshua Zinner died from the ingestion of cocaine and fentanyl purchased from Frasier.

Because the jury made these findings, Allen carries a heavy burden to have us reverse them. We will uphold the jury's verdict if substantial evidence, viewed in the light most favorable to the government, supports it. *See United States v. Williams*, 130 F.4th 177, 181 (4th Cir. 2025). And in viewing the evidence in that light, we will "assume that the jury resolved all contradictions in the testimony in favor of the Government." *Id.* at

2

182 (quoting *United States v. Roe*, 606 F.3d 180, 186 (4th Cir. 2010)).   Applying this standard, we affirm.

I

Before addressing Allen's specific arguments, we set forth the evidence presented to the jury about the conspiracy in general because Allen's challenges must be considered in the context of this broader evidence.

For more than two years, from January 2021 to March 2023, Allen and Frasier participated in a conspiracy to distribute cocaine and fentanyl in and about Durham, Raleigh, and Chapel Hill, North Carolina, targeting mainly students at Duke University and the University of North Carolina.   Both actively participated in the drug-distribution business; both, for example, helped mix, cut, weigh, and package the drugs that they sold, and they texted each other about these activities routinely.   Indeed, Allen texted Frasier several images of her weighing bags of cocaine, and she retained a note on her cell phone containing instructions related to diluting cocaine with a cutting agent.   They celebrated the success of their business, which was producing substantial sums of money, and pushed aggressively to sell to more students.

The packaging that the two used for the distribution of drugs — half-gram Ziploc baggies — became well recognized by the students.   They testified that they received drugs from Allen and Frasier in "like .5 gram baggies," in "half gram baggies," in "miniature Ziploc bags," and in "a 1x1 Ziploc."

Allen and Frasier's drug business also involved the use of Frasier's camouflage bookbag as a storage container or repository for drugs and drug-related paraphernalia.   The

3

government introduced numerous text messages illustrating how the two used the bookbag. In one message, Frasier directed Allen to hunt for a little "brown bag of dope" in the bookbag if she did not already have it. In another, Frasier inquired, "Where you put the coke," and Allen responded that the coke was in the "small pocket in front" of the "book bag." And on a couple more occasions, Allen reminded Frasier that he had left a bag of weed and a bag of pink and white pills in the bookbag. The bookbag thus served as a tool of their business.

While the evidence showed that either Allen or Frasier delivered their bags of drugs to customers, it also indicated that toward the end of the conspiracy, it was Allen who made most of the deliveries. Yet, regardless of who delivered the drugs, both Allen and Frasier used Allen's blue Toyota RAV4 almost exclusively, and this too served as a tool of their business.

For protection, Allen often carried one of two Glock handguns, which she had lawfully purchased, and the evidence showed that she did so frequently in connection with her drug-distribution activities. The gun that she carried most often featured a purple grip, so the pair colloquially referred to it as "purple." In one text, for example, Frasier directed Allen to bring her purple Glock when selling what seemed to be two baggies of drugs to a man in her apartment complex — "Take purple, walk out to the car, and just give them two of any new or old." And in another text, Frasier told Allen that she "should have pulled out" when a customer became unruly, to which Allen responded that she did not "want to pull out cause he be the mf to run to the Park Rangers and tell 'em I got a gun here." There was also evidence that later on in the conspiracy, Allen indicated that she was carrying a

4

gun "all the time now," implying either that she was using it for purposes unrelated to drug distribution or that she was using it in connection with every drug transaction.

During early 2023, the Drug Enforcement Agency detained a student selling drugs who was a customer of Allen and Frasier, and the student then agreed to make a controlled purchase from them. To set up the purchase, the student contacted Frasier, and Frasier told him that his "girl" would meet the student at a restaurant to deliver the drugs. The student then met Allen on February 23, 2023, and purchased more than 10 grams of cocaine from her, packaged in small Ziploc ".5 gram baggies." The student recorded the transaction in its entirety for law enforcement.

A couple of weeks later, on March 8, a University of North Carolina student named Joshua Zinner texted Frasier, requesting cocaine, and Frasier sold Zinner cocaine at about 3:15 p.m. on that day. By 4:00 p.m., however, when Zinner went to work, his supervisor observed that Zinner was "sweating and looked visibly unwell." Zinner explained that he had been throwing up because of an antibiotic, Amoxicillin, that he had taken that day, and the supervisor sent Zinner home. A few hours later, Zinner texted a friend, noting that he thought "the antibiotic f'd me up because I felt fine all day until I took it," but he also searched on Google for the "relationship between cocaine use and taking antibiotics." After Zinner failed to show up for work on March 10, a coworker reached out to his roommate, who then went to Zinner's room and found him in bed, dead. Next to Zinner lay three baggies of cocaine and fentanyl, two of which were mostly empty.

In the early hours of March 9, Frasier also sold cocaine to Patrick Rowland, a student at Duke, and his friend, Elizabeth Burton. Both also reacted badly to the cocaine. Rowland

5

explained, "It was a very intense head rush, and it left me dizzy, which is something I hadn't felt before; and then, within the next couple minutes, I started to lose control of my body, and it felt like — I don't know. It was just — my body was kind of going everywhere. And I threw up for the next 19 hours afterwards." Rowland's friend, Burton, however, did not fare as well; she died from the ingestion of cocaine and fentanyl.

On March 15, 2023, five days after Zinner's body was found, law enforcement officers were surveilling the barbershop where Frasier worked. During their surveillance, they observed Allen arrive at the scene in her blue Toyota RAV4 and park about a block from the barbershop. Frasier then exited the barbershop with his bookbag and entered Allen's car. But as law enforcement officers approached, he threw the bookbag onto Allen's lap and exited the vehicle, and the officers then arrested him. After Allen placed the bookbag on the passenger's seat, she too was arrested.

The bookbag recovered from the blue Toyota RAV4 on March 15 was found to contain 7.34 grams of powdered fentanyl, 80 Oxycodone pills, a digital scale, and $12,000 in cash. The officers also recovered a Glock .45 semi-automatic handgun with an extended magazine from the driver's side of the Toyota's floorboard and empty plastic baggies from the vehicle's console. And from Allen's handbag, they recovered two Ziploc baggies that contained 1.16 grams of cocaine and a cutting agent, alongside a red straw with cocaine residue.

At trial, the government presented evidence from the Associate Chief Medical Examiner in Raleigh, who testified that Zinner's death was caused by the ingestion of fentanyl and cocaine. She based her conclusion on a urine sample, multiple blood tests, a

full toxicology report, a physical examination, and the report of the medical investigator who had been at the scene and observed the presence of empty baggies of cocaine and fentanyl. The Medical Examiner stated that Zinner's body contained a sufficient amount of cocaine to cause cardiac arrest and more than three times the concentration of fentanyl that any physician might prescribe for medical purposes. She concluded that if the drugs were not the only cause of Zinner's death, they were, to be sure, the straw that broke the camel's back.

Based on this evidence, the jury found, as relevant to Allen's arguments, (1) that Allen knowingly possessed with the intent to distribute the cocaine and fentanyl recovered from the vehicle on March 15, when she was arrested; (2) that she possessed a firearm on March 15 in furtherance of a drug offense; and (3) that Zinner's death resulted from the ingestion of the drugs that Frasier sold him.

## II

### A

First, as to the jury's finding that Allen possessed drugs on March 15 with the intent to distribute — the drugs in the bookbag and her purse — we conclude that the evidence was sufficient for the jury to conclude that she possessed with the intent to distribute them. The evidence showed that Frasier routinely used and carried the bookbag during the course of the conspiracy for purposes of their common drug business. Both Allen and Frasier texted the other numerous times about drugs that they had stored in the bag or removed from it. For example, on multiple occasions, Allen informed Frasier that their drugs —

7

ranging from cocaine to marijuana to pink and white pills — were stored in the bookbag, sometimes providing the specific pocket in which they were stored. And on another occasion, Frasier asked Allen to hunt through the bookbag for a "brown bag of dope." From this context, the jury could well have concluded that the bookbag was a tool of their business, indeed a repository routinely used to store drugs and paraphernalia during the course of the conspiracy, the contents of which were known to both Allen and Frasier. It was this bookbag that Frasier carried on March 15, 2023, when he left the barbershop and that he handed to Allen in her blue Toyota RAV4. From all of this the jury could conclude that Allen knew well what was in the bag that she and Frasier jointly possessed.

Of course, the contents of the bag supplied the evidence of intent to distribute. Its contents featured a veritable "who's who" of such indicia — $12,000, a digital scale, 80 Oxycodone pills, and over 7 grams of fentanyl. And its contents were consistent with their drug-distribution business generally and the related items recovered from Allen's vehicle that day — the loaded Glock on the floorboard, the baggies in the console, and the cocaine that Allen was carrying in her purse. Moreover, all these items were physically linked to the blue Toyota RAV4, which was the primary vehicle that the two used for their drug business.

While Allen argues an absence of proof that she knew what was in the bookbag, the jury could have, based on the evidence, rejected that suggestion in favor of finding that Allen possessed the bookbag, knowing that it contained the illegal drugs and paraphernalia of their business.

8

B

Allen next contends that the jury had insufficient evidence to find that she possessed the Glock handgun on March 15 in furtherance of a drug offense. She rests her argument on her claim that she committed no drug offense on March 15 and therefore that she could not have possessed the handgun in furtherance of a drug offense. Specifically, she argues:

> Moreover, if Allen didn't have the knowledge and intent to commit Counts Three and Four [possession of cocaine and fentanyl, respectively], she didn't possess her Glock .45 in furtherance of Counts Three and Four, meaning Judge Osteen also erred by not dismissing Count Five [possession of a firearm in furtherance of a drug offense] under the 21 U.S.C. § 841(a)(1) theory.
>
> *         *         *
>
> Because the Government didn't present substantial evidence for the aiding and abetting charges in Counts Three and Four — it didn't present substantial evidence for the aiding and abetting charge in Count Five. Therefore, the Court should vacate Counts Three, Four, and Five.

This argument, however, falls with the failure of her challenge to her convictions for drug possession on March 15. Since we have rejected her challenge to her convictions for those drug offenses, we must also reject her argument as to possession of a firearm in furtherance of those offenses.

Nonetheless, even were she to argue further that she did not possess the gun *in furtherance of* any drug-trafficking offense, her argument would also fail. She possessed the gun within an arm's reach of $12,000 in cash, a digital scale, 80 Oxycodone pills, more than 7 grams of fentanyl inside the bookbag, 1.16 grams of cocaine in her purse, and empty Ziploc baggies in the center console. Moreover, she possessed the gun in the same car that the pair used regularly and almost invariably to distribute drugs. And, resting at her feet,

9

the firearm was readily accessible throughout her commission of the offense. Her text messages also indicated that she had a history of using one of her Glock firearms for protection during her drug trafficking.

While Allen suggests an innocent purpose for her possession of the gun — *i.e.*, for her general protection — any tension created by this suggestion and her possession of the gun on March 15 in the context of a drug offense was for the jury to resolve, and it surely had enough evidence to resolve that against her. *See United States v. Moore*, 769 F.3d 264, 269–70 (4th Cir. 2014); *United States v. Lomax*, 293 F.3d 701, 705–06 (4th Cir. 2002). Moreover, any suggestion that the *lawfulness* of her ownership of the gun could provide her with cover misconceives the elements of her crime, which require the possession of a gun, *whether lawful or not*, for the unlawful purpose of furthering a drug offense. *See* 144 Cong. Rec. 26608 (1998) (statement of Sen. Mike DeWine) ("So, 924(c) comes with a message: 'If you mix guns and drugs, or guns and violence, we're going to come after you — and the price will be high'"); *Muscarello v. United States*, 524 U.S. 125, 132 (1998).

## C

Finally, Allen challenges the sufficiency of evidence that cocaine and fentanyl caused Zinner's death. While she points to steps that the Medical Examiner could have taken, but did not, to better have confirmed her conclusions — such as conducting an autopsy, which might have revealed further that the drugs had permeated Zinner's organs — the government nonetheless presented sufficient evidence that Zinner's death was caused by cocaine and fentanyl, as evidenced by the lethal amounts in his blood and urine. The Medical Examiner testified to the precise quantities of cocaine and fentanyl in Zinner's

10

blood and unequivocally stated that they were the but-for cause of Zinner's death.  She drew those data from a urine test, a blood sample, and a toxicology report.  And the conclusion was logically confirmed by the on-scene evidence of empty bags of drugs next to Zinner's body.  The Medical Examiner further testified that, even if other factors like Zinner's illness or use of unprescribed Amoxicillin had contributed to his death, the cocaine and fentanyl were still clearly the straw that broke the camel's back.  And Allen's own expert agreed that the concentrations of cocaine and fentanyl found in Zinner's system were sufficient to have killed him.  The jury thus had sufficient evidence from which to conclude that cocaine and fentanyl were the but-for cause of Zinner's death.

*    *    *

At bottom, this appeal turns simply on whether the jury had sufficient evidence to convict, and we resolve that question by viewing the evidence in the light most favorable to the government and assuming that the jury resolved all contradictions in the government's favor.  Our role is not to weigh the evidence and resolve factual disputes; this was for the jury to do.  Under this standard, we conclude that the jury had sufficient evidence to support its verdict.

The judgment of the district court is

AFFIRMED.