**F I L E D**

**UNITED STATES COURT OF APPEALS**

**August 22, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

FREDERICK ALLEN GRUBER,

    Defendant - Appellant.

No. 04-7101
(E. D. Oklahoma)

(D.C. No. 04-CR-3-WH)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **BRISCOE**, and **O'BRIEN**, Circuit Judges.

During a two-stage bifurcated trial, a jury convicted Frederick Allen Gruber of charges made against him by indictment, including Count 2, which charged Mr. Gruber with assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer while using a dangerous weapon in violation of 18 U.S.C. § 111(a) & (b). Mr. Gruber appeals only his conviction with respect to this charge, arguing that there was insufficient evidence to support a conviction for a violation of 18 U.S.C. § 111(b), which provides for an enhanced penalty where a defendant

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

"uses a deadly or dangerous weapon" when assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer in violation of 18 U.S.C. § 111(a). He does not dispute the sufficiency of the evidence with respect to his conviction pursuant to § 111(a). We agree with Mr. Gruber that the government did not present sufficient evidence to prove that he "use[d]" the gun that was found at the scene of the incident with the federal officer, and we therefore reverse his conviction and remand for re-sentencing in accordance with this opinion.

## I. BACKGROUND

The evidence, viewed favorably to the jury verdict, shows that on the morning of July 31, 2003, a man wearing a Groucho Marx mask robbed the First National Bank in Ardmore, Oklahoma. The perpetrator, later found to be Mr. Gruber, used a gun to commit the robbery and fled from the scene of the crime. Some time thereafter, law enforcement officials received information possibly connecting Mr. Gruber with the Ardmore robbery. After receiving the tips, officials began to search for him.

On December 8, 2003, a group of local and federal law enforcement officials spotted Mr. Gruber driving a black Oldsmobile in Marietta, Oklahoma. When the officials attempted to stop him, he verbally refused to stop, and a high-speed chase ensued. At some point during the chase, Mr. Gruber abandoned his vehicle and began to run. FBI Special Agent Craig Overby then followed Mr.

Gruber on foot. Mr. Gruber ducked behind a nearby passenger car parked on the street in an attempt to hide himself from the pursuing agent.

When Agent Overby caught up to Mr. Gruber, Agent Overby positioned himself on the opposite side of the car, with the vehicle separating them. Agent Overby identified himself with his gun drawn, told Mr. Gruber that he was under arrest, and repeatedly instructed Mr. Gruber to keep his hands held high. For both Agent Overby and Mr. Gruber, the other was visible from only the chest up. Mr. Gruber initially complied with Agent Overby's orders, keeping his hands up, but then he moved for cover, dropped his hands to his waist out of the agent's line of sight, and bent down. As Mr. Gruber made this maneuver, Agent Overby fired his gun at Mr. Gruber, and the bullet hit him in the neck. Mr. Gruber fell to the ground on his stomach with his hands underneath him. Backup officers arrived on the scene and succeeded in restraining and arresting Mr. Gruber. Then, as Mr. Gruber recites in his brief, "when [Mr. Gruber] was rolled over, a loaded .45 caliber semi-automatic pistol was found on the ground where his hands had been." Aplt's Br. at 7. Officers also found $9,746.00 in cash on Mr. Gruber. Among the confiscated money were eighteen of the twenty "bait bills" that had been taken in the Ardmore robbery.

Subsequently, a grand jury indicted Mr. Gruber in a multiple-count indictment, charging him with: Count one, being a felon in possession of a firearm and being a felon in possession of a firearm affecting interstate

commerce, both in violation of 18 U.S.C. §§ 922(g)(1), 924(e); Count two, assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer while using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a) & (b), 1114; Count three, using and carrying a firearm during and in relation to, and possession of a firearm in furtherance of a violent federal felony (Count two), in violation of 18 U.S.C. § 924(c)(1); Count four, being a felon in possession of a firearm and being a felon in possession of a firearm affecting interstate commerce, both in violation of 18 U.S.C. §§ 922(g)(1), 924(e); Count five, armed bank robbery involving assault and jeopardy of life, in violation of 18 U.S.C. § 2113(a) & (d); Count six, using and carrying a firearm during and in relation to, and possession of a firearm in furtherance of a violent federal felony (Count five), in violation of 18 U.S.C. § 924(c)(1); and Count seven, possession and concealment of money stolen from a bank, in violation of 18 U.S.C. § 2113(c).

In stage one of a bifurcated jury trial, Mr. Gruber was found guilty of armed bank robbery involving assault and jeopardy of life, and using and carrying a firearm in relation to that violent felony (Counts five and six). During the second stage, he was found guilty of being a felon in possession of a firearm, assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer while using a dangerous weapon, using or carrying a firearm in relation to that violent felony (Counts one, two, and three). The jury also found

-4-

Mr. Gruber guilty of count seven, but the district court granted the government's motion to vacate this conviction. The jury found Mr. Gruber not guilty on count four.

At sentencing, the district court found that Mr. Gruber was subject to enhanced punishment under 18 U.S.C. § 924(e), part of the Armed Career Criminal Act ("ACCA"). Under § 924(e), a "person who violates section 922(g) of this title [being a felon in possession of a firearm] and has three previous convictions . . . for a violent felony . . . shall be fined under this title and imprisoned not less than fifteen years . . . ." Relying on *Blakely v. Washington*, 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Mr. Gruber objected to the determinations in the presentence report that he had been convicted of three "violent felonies" for purposes of the ACCA, claiming that such determinations were findings of fact that must be made by a jury beyond a reasonable doubt and not by the sentencing court by a preponderance of the evidence. Rec. vol. VIII, at 3. Concluding that Mr. Gruber had three prior convictions for violent felonies, the district court overruled his objection and sentenced Mr. Gruber to 687 months' imprisonment applying 18 U.S.C. § 924(e). *Id.* at 4, 11. The district court additionally imposed a term of 36 months' supervised release on Count two, and a term of supervised release of 60 months for Counts one, three, five, and six, to be served concurrently. *Id.* vol. 1, doc. 44, at 4. (Judgment in a Criminal Case, dated Sep. 15, 2004). Finally, the district

court ordered Mr. Gruber to pay the First National Bank restitution of $14,862.25. *Id.* at 6.

## II. DISCUSSION

On appeal, Mr. Gruber asserts that there was insufficient evidence to support a conviction for Count two of the indictment that alleged the violation of 18 U.S.C. § 111(b), which provides for an enhanced penalty where a defendant "uses a deadly or dangerous weapon" when assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer. Specifically, he argues that there was no evidence of use because the complaining officer only saw Mr. Gruber's hands drop from view as the two faced off on opposing sides of the chest-high vehicle, and did not actually see Mr. Gruber brandishing a weapon.[1] Mr. Gruber also challenges his sentence as being imposed in violation of his constitutional rights, as recently articulated by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005). He contends that the district court committed constitutional error when it concluded by a preponderance of the evidence that his prior convictions were "violent felonies" under the ACCA. We address both these arguments below.

---

[1] At oral argument, Mr. Gruber's counsel expressly stated that he did not appeal the 18 U.S.C. § 924(c) conviction, but then later, asked the panel nonetheless to consider reversing the § 924(c) conviction if it reversed the predicate conviction under 18 U.S.C. § 111(b). Absent extraordinary circumstances, we will not consider arguments raised for the first time at oral argument. *United States v. Lande*, 40 F.3d 329, 331 n.2 (10th Cir. 1994).

A.    Sufficiency of the Evidence

We begin by examining Mr. Gruber's claim that the government presented insufficient evidence to convict him under 18 U.S.C. § 111(b).  We review sufficiency of the evidence claims de novo.  *United States v. Hamilton*, 413 F.3d 1138, 1143 (10th Cir. 2005).  In so doing, "we view the evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty of the crime beyond a reasonable doubt."  *Id.* (internal quotations omitted).

During the second stage of the trial, the jury found Mr. Gruber guilty of violating 18 U.S.C. § 111(a), assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer, and also of violating 18 U.S.C. § 111(b), using a deadly weapon during and in relation to the underlying offense in § 111(a).  The applicable statutes provide in relevant part:

(a) In general. --Whoever--

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . . .

. . . .

(b) Enhanced penalty.--Whoever, in the commission of any acts described in subsection (a) uses a deadly or dangerous weapon . . . or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111(a) & (b).  The instructions to the jury explained the elements of

this count to be:

> One: The defendant forcibly assaulted, resisted, opposed, impeded, intimidated or interfered with an officer or employee of the United States, Craig Overby;
> Two: At the time, Craig Overby was engaged in official duties.
> Three: The defendant used a deadly or dangerous weapon.

Rec., vol. I, doc. 38, at 21.

Mr. Gruber specifically takes issue with his conviction under subsection (b) of the statute because of the jury's finding that he "used" a dangerous weapon to assault, resist, oppose, impede, intimidate, or interfere with Agent Overby during their standoff. He contends that the fact that a gun was found on the ground under him after he was subdued "cannot relate back to create a fact that did not exist during the time of the offense." Aplt's Br. at 13.

During trial, the government called a number of witnesses to show that Mr. Gruber "carried" a gun during a violent federal felony for purposes of 18 U.S.C. § 924(c). The government's argument that Mr. Gruber violated section 924(c) was based on testimony of witnesses who stated that he had a gun in his possession during the bank robbery, testimony of friends who recalled that Mr. Gruber owned such a gun, and testimony of law enforcement officials who remembered that *after* subduing him, they found the gun on the ground underneath his body. The government did not, however, present any witnesses testifying that they saw Mr. Gruber "use" his gun during his face-to-face encounter with Agent Overby. Instead, when Agent Overby testified regarding the incident, he stated that he

never actually saw Mr. Gruber's .45-caliber pistol while the two men stared at each other from opposite sides of the parked car. Agent Overby testified that when Mr. Gruber dropped his hands out of sight, he assumed that Mr. Gruber was reaching for a weapon of some sort, but the agent never actually saw it. After backup officers subdued Mr. Gruber, they located the pistol on the ground.

This after-the-fact discovery may indeed have validated Agent Overby's fear that Mr. Gruber was holding a weapon. But it does not rise to the level of the "active employment" definition of use, which includes "brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Bailey v. United States*, 516 U.S. 137, 148 (1995). In *Bailey*, the Court distinguished between the terms "carry" and "use" in the context of 18 U.S.C. § 924. *Id.* The Court gave "use" its ordinary and natural meaning and limited the application of "use" to instances of active use, because otherwise no role would remain for the term "carry." *Bailey*, 516 U.S. at 147. Moreover, the Court reasoned that "use" must mean something more than mere possession, since Congress frequently employed the term "possess" in gun-crime statutes and "[h]ad Congress intended possession alone to trigger liability . . . , it easily could have so provided." *Id.* at 143. Though *Bailey* does not deal with 18 U.S.C. § 111(b), the reasoning is persuasive. The ordinary and natural meaning of "use" in § 111(b) requires that a defendant must actively, in the *Bailey* sense, use the deadly weapon to qualify for § 111(b)'s enhanced penalties.

In its brief, the government marshals no evidence to show that Mr. Gruber's "use" of the gun was active or that the gun was disclosed. While the evidence would likely support a finding that Mr. Gruber "carried" the weapon during his standoff with the FBI agent, he did not brandish, strike with, fire or even attempt to fire the gun. During oral argument (but not in its brief), the government cited a part of the transcript of the jury trial, where Agent Bob Horn testified that during an interview immediately after his arrest and while he was recovering from having been shot, Mr. Gruber admitted that "he [had] reached for his weapon" during the standoff. Rec. vol. VI, at 591 (Tr. of Jury Trial, dated Mar. 24, 2004). Agent Horn also testified that Mr. Gruber would not admit to reaching for the gun with the intent to shoot Agent Overby; instead, Agent Horn explained that Mr. Gruber had insisted that "[i]t's possible that I was just reaching for the weapon to take it out and throw it on the ground and give myself up." *Id.* at 593. Agent Horn also explained that Mr. Gruber never told him that he intended to "to pull [the] gun and intimidate or interfere with . . . Agent Overby," and that Mr. Gruber had stated that "he had no intention o[f] shooting anybody." *Id.* at 600.

This testimony is insufficient to establish active use, as required by the plain meaning interpretation of the term "use," provided by the Supreme Court in *Bailey*. We acknowledge that this is a fine distinction, but one that is significant, given the plain meaning of the term "use" as interpreted by the Supreme Court: "if the gun is not disclosed or mentioned by the offender, it is not actively

employed, and it is not 'used.'" *Bailey*, 516 U.S. at 149.

Even applying the highly deferential standard of review to the government on appeal, there was insufficient evidence to support Mr. Gruber's conviction under § 111(b). "We have warned against sustaining a conviction based on mere suspicion or speculation: 'While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference." *United States v. Dunmire*, 403 F.3d 722, 724 (10th Cir. 2005) (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)). Without any evidence or testimony, it is only speculation to say that Mr. Gruber actually "used" the gun during the incident with Agent Overby. The circumstantial evidence presented cannot shed light on whether or not Mr. Gruber "used" the gun *during* the incident, especially in light of the fact that Agent Overby admitted to having never seen Mr. Gruber's gun. While this evidence may be enough to prove that Mr. Gruber "carried" and "possessed" the gun, it does not prove "use," an essential element of 18 U.S.C. § 111(b).

B.    Sentencing Enhancement

We next examine Mr. Gruber's argument that the district court violated *Booker* by not submitting to the jury the question of whether his prior convictions constituted "violent felonies" under the ACCA, 18 U.S.C. § 924(e). A sentence enhancement under the ACCA is a legal issue, and, thus, we review it de novo.

-11-

*United States v. Moudy*, 132 F.3d 618, 619 (10th Cir. 1998).

We agree with Mr. Gruber's admission in his brief that "the deciding panel in the present case is bound by [*United States v.*] *Moore*, [401 F.3d 1220 (10th Cir. 2005)] and the prior conviction exception imposed by the Supreme Court." Aplt. Br. at 17. We note that Mr. Gruber raises this issue as a preservation technique to possibly overturn *Moore* by an *en banc* decision from this court or a decision by the United States Supreme Court. Unless and until that happens, we are bound by the precedent of this court articulated in *Moore*. 401 F.3d at 1226 ("Neither the existence of prior convictions, nor their classification as 'violent felonies,' constitute facts that must be charged in an indictment and proven to a jury under a 'beyond a reasonable doubt' standard.").

### III. CONCLUSION

Accordingly, we **REVERSE** the district court's judgment on Count two and REMAND for re-sentencing in accordance with this opinion. We **AFFIRM** all other aspects of the district court's judgment and its sentence.

Entered for the Court

Robert H. Henry
Circuit Judge

-12-

04-7101 *United States v. Gruber*
**O'BRIEN**, J. dissenting.

Does a tree falling beyond human earshot make a sound? Has a fleeing felon who removes a deadly weapon from his waistband during a violent encounter with the police used the weapon, even though it was not seen by the police until he was incapacitated? The Majority says such conduct is not use of a weapon in violation of 18 U.S.C. § 111(b). I respectfully disagree.

A jury convicted Frederick Gruber of assaulting a federal officer with a dangerous weapon. Today, the Majority vetoes the jury's decision. Its requirement for "use" of a weapon (actively brandishes, strikes with, fires or attempts to fire a gun) relates to a different statute, is too narrow and is not warranted by these facts.

The Majority relies on *Bailey v. United States* in reaching its decision. 516 U.S. 137 (1995). *Bailey* did not involve 18 U.S.C. § 111(b), with its "use" provision. Rather, *Bailey* construed the "use and carry" provision of 18 U.S.C. § 924(c)(1). That statute, the Court decided, "requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id*. at 143.

*Bailey* actually involved two consolidated cases testing the application of § 924(c)(1), which penalizes the use of a firearm during the commission of a violent or drug trafficking offense. Roland Bailey's conviction rested on a loaded pistol found inside a bag in his locked car trunk after he was arrested. *Id*. at 139-

40, 151. Candisha Robinson's conviction was based on an unloaded, holstered firearm found locked in a trunk in a bedroom closet of her apartment. *Id.* at 140, 151. The weapons were not accessible to the defendants. On those facts the Supreme Court held the government failed to prove that either defendant was "using" a firearm to further drug trafficking activities, noting "that 'use' must connote more than mere possession of a firearm by a person who commits a drug offense." *Id.* at 143.

The Court discussed the ambiguity of the word "use" resulting from its various connotations. It was particularly concerned, based upon the facts before it and the specific statutory language, with equating possession and use, saying:

> Under [the government's] reading, mere possession of a firearm by a drug offender, at or near the site of a drug crime or its proceeds or paraphernalia, is a "use" by the offender, because its availability for intimidation, attack, or defense would always, presumably, embolden or comfort the offender. But the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1). Perhaps the nonactive nature of this asserted "use" is clearer if a synonym is used: storage. A defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession.

*Id.* at 149.

*Bailey* is distinctly different from this case in two respects: its facts and the relevant statute. In *Bailey*, the defendants' "use" of weapons consisted of having them locked away, but nearby. Here Gruber had a loaded firearm in his waistband and was reaching for it when he was shot. His reach was at least

partially successful, as he had removed the weapon from his waistband. After Gruber was subdued it was found on the ground directly beneath him — and where his hands had been tucked under his belly. Unlike *Bailey*, where the weapons were not accessible to the defendants, Gruber's weapon was not only on his person, but deployed.[1]

Furthermore, § 924(c)(1), the statute analyzed in *Bailey*, differs from this one, § 111(b), in a critical way. Section 924(c)(1) mandates certain penalties if a defendant "during and in relation to any crime of violence or drug trafficking crime . . . , *uses or carries* a firearm." (Emphasis added.) In order to give effect to the "or carries" language of the statute, the Court in *Bailey* chose a "limited, active interpretation of 'use'": "brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Bailey*, 516 U.S. at 146, 148; *see Muscarello v. United States*, 524 U.S. 125, 136 (1998) ("In *Bailey*, however, we limited 'use' of a firearm to 'active employment' in part because we assumed 'that Congress . . . intended each term to have a particular, nonsuperfluous meaning.' A broader interpretation of 'use,' we said, would have swallowed up the term 'carry.'") (internal citation omitted). The actual holding

---

[1] A more benign interpretation of the facts is possible. Gruber offered one, which the Majority apparently accepts. (Majority Op. at 10.) But, if we respect the jury's role, as we frequently say, then we must consider the facts and the inferences to be drawn therefrom in a manner consistent with the verdict, if we can reasonably do so. The evidence here would permit a reasonable jury to find that Gruber reached for and retrieved the weapon from his waistband and continued to avail himself of it until forcibly disarmed.

of *Bailey* is "that the language, context, and history of § 924(c)(1) indicate that the Government must show active employment of the firearm" to "establish 'use' for the purposes of the statute[.]" *Bailey*, 516 U.S. at 144.

Section § 111(b) makes no distinction between using and carrying a weapon. It simply provides that "[w]hoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon" shall be subject to an enhanced penalty. Thus, just as the Court in *Bailey* gave effect to Congress' use of two separate terms in § 924(c)(1) — use and carry — so, too, should we give effect to the use of a single term in § 111(b) — use. A broader reading of "use" in this case is consistent with the statute's language and supports the jury's verdict.

This jury was instructed on the elements of assaulting a federal officer with a dangerous weapon:

> One: The defendant forcibly assaulted, resisted, opposed, impeded, intimidated or interfered with an officer or employee of the United States, Craig Overby[.]
>
> Two: At the time, Craig Overby was engaged in official duties.
>
> Three: The defendant used a deadly or dangerous weapon.
>
> "Forcibly" means by use of force. A "deadly and dangerous weapon" is an object used in a manner likely to endanger life or inflict serious bodily harm.
>
> The term "forcibly assaults" means any deliberate and intentional attempt or threat to inflict physical injury upon another with force or strength when that attempt or threat is coupled with an apparent ability

-4-

to do so. Although a "forcible assault" may be committed by a defendant without actually touching, striking or doing bodily harm to another, the government must prove that the actions of the defendant were of such a nature to put the person against whom they were directed in fear of immediate bodily harm. There is a use of force when one person intentionally wounds another, or when one person intentionally makes a display of force which reasonably causes a person to fear immediate bodily harm.

(R. Vol. 1, Doc. 38 at 21-23.)

The jury was also instructed that it could draw "reasonable inferences" from the evidence in the case:

While you should consider only the evidence in the case, you are permitted to draw such reasonable inferences from the evidence as you feel are justified in light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and the evidence in this case.

(*Id*. at 7.) The defense did not object to these instructions.

We review a sufficiency of the evidence challenge only to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Our method of review is also restricted.

In conducting [a sufficiency of the evidence] review this Court may neither weigh conflicting evidence nor consider the credibility of witnesses. It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented.

*United States v. Zabriskie*, 415 F.3d 1139, 1144 (10th Cir. 2005) (internal citation

and quotations omitted).

We do not examine the evidence in "bits and pieces," but instead "evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997) (quotations omitted). We may overturn a guilty verdict on sufficiency grounds only if no reasonable jury could have reached such a verdict on the evidence presented. *United States v. Shepard*, 396 F.3d 1116, 1119 (10th Cir. 2005).

The jury considered evidence in three key areas: Gruber's actions; Agent Overby's actions, knowledge and thoughts; and Gruber's admissions. With respect to Gruber's actions, it heard the following testimony: On December 7, 2003, Gruber said "he was going to go out in a blaze of glory." (R. Vol. 6 at 444.) On December 8, Richard Eidson reported to the police that Gruber had robbed a bank in Ardmore and was going to shoot him. That same day, local law enforcement officers and FBI agents formulated a plan to look for Gruber in Marietta, Oklahoma. For good reason, Gruber was considered armed and dangerous. Gruber drove past the area where the officers were gathered, and after ignoring efforts to stop him, took off at a high rate of speed, with the officers in pursuit. The vehicle pursuit ended when Gruber drove his car off the road and up against an abandoned house. Overby pursued Gruber on foot. The two men eventually confronted each other from opposite sides of a parked vehicle.

-6-

Overby trained his weapon on Gruber, identified himself as an FBI agent, and ordered Gruber not to move. Gruber momentarily complied, raising his clenched fists up to, but not over, his head. When Gruber suddenly dropped his hands out of Overby's sight, the agent shot Gruber in the neck. Gruber dropped to his knees and began screaming "I'm shot, I'm shot." (*Id.* at 478.) He did not put his hands to his neck (as one might expect) but instead lay on the ground on his stomach with his hands and most of his arms tucked under his body, moving "like he was reaching for something." (*Id.*) Despite his injuries and the shouted orders from several officers to put his hands behind his back, Gruber kept his hands tucked underneath his belly until forced at gunpoint to comply. When Gruber was finally handcuffed and rolled on his side, a handgun was found on the ground beneath him. It was not only loaded, but a live round was in the chamber, ready to fire with a squeeze of the trigger.

In addition, the jury heard Overby testify about what he knew prior to his confrontation with Gruber: Gruber was considered armed and dangerous, he was wanted for bank robbery, and he had made threats about going out "in a blaze of glory." (*Id.* at 499.) Overby told the jury he donned a bulletproof vest in response to the 911 call made on December 8 and he drew his weapon as soon as he got out of his car to pursue Gruber on foot. The jury saw Overby demonstrate the way in which Gruber put his hands up to his head, "close to [his] ears, the hands were shaking and they were clenched, kind of like a body builder flexing

his muscles." (*Id.* at 475.) The jury watched Overby demonstrate how - and how quickly - Gruber dropped his hands out of sight. Overby also testified that once he saw Gruber on the ground, he "was concerned that, that he was going for the weapon <u>again</u> and was going to shoot, try to shoot [him] <u>again</u>." (*Id.* at 478) (emphasis added).

Finally, Agent Bob Horn of the Oklahoma State Bureau of Investigation testified about Gruber's statements to him on December 8:

> When he got out of the car, he was surrounded by approximately ten police officers or officers and he heard one officer tell him to freeze and that he reached for his weapon, indicating to me when I was talking to him using his right hand reached to the front of his pants that he was wearing indicating that he was reaching to his waistband for his weapon.

(*Id.* at 591-92.) The jury heard Horn's testimony that Gruber said "[h]e was reaching for his weapon" or "had his hand on the pistol" when Overby shot him. (*Id.* at 592-93.) Gruber also told Horn, "It's possible that I was just reaching for the weapon to take it out and throw it on the ground and give myself up." (*Id.* at 593.) The jury could thus evaluate whether Gruber attempted to shoot, surrender his weapon, or merely find solace in its cold, cozy grip.

Gruber does not argue the evidence was insufficient to show an assault on a federal officer, only that his weapon was not used in the process.[2] The Majority

---

[2] I will not dwell upon the assault except to note: 1) the jury was properly instructed (without objection) on the issue; 2) the jury could have concluded Gruber was attempting to get his weapon (and did) when he dropped his hands

(continued...)

accepts this argument, concluding there was insufficient evidence to demonstrate "use" of Gruber's .45 caliber semi-automatic weapon, primarily because no one saw it until he had been subdued and handcuffed.[3] That narrow view of the evidence does not allow for reasonable inferences.[4] The assaulted officer does not have to see the weapon,[5] particularly when he is reliably aware of its presence.

Evidence that Gruber reached for and even touched his concealed weapon is

---

[2](...continued)
below eye level; 3) the jury could have concluded Gruber would have used his weapon against the federal agent had his actions not been thwarted by a bullet to the neck; and 4) the federal officer was put in fear of bodily harm.

[3] The Majority notes:

Without any evidence or testimony, it is only speculation to say that Mr. Gruber actually "used" the gun during the assault. The circumstantial evidence presented cannot shed light on whether or not Mr. Gruber "used" the gun *during* the assault on Overby, especially in light of the fact that Agent Overby admitted to having never seen Mr. Gruber's gun. While this evidence may be enough to prove that Mr. Gruber "carried" and "possessed" the gun, it does not prove "use," an essential element of 18 U.S.C. § 111(b).

(Majority Op. at 11.)

[4] The "no one saw me do it" argument has a dieting corollary — the food no one sees you eat doesn't count. It is a comfortable diet but you don't lose weight.

[5] Would there be any question about Gruber's "use" of his weapon if it had been in his hand, behind the car and below eye level, when Overby first confronted him? Similarly, would it not also have been a "use" if another officer, but not Overby, saw the weapon in Gruber's hand after the unexpected and aggressive move — when Gruber dropped his hands out of Overby's sight?

a sufficient "use" under 18 U.S.C. § 111(b). It would even be sufficient under *Bailey's* § 924(c)(1) definition, which "includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Bailey*, 516 U.S. at 148 (emphasis added). The jury could reasonably have found a thwarted attempt to fire the weapon — a "use" explicitly within the *Bailey* definition. In any event, Gruber's conduct is sufficient "to show an *active employment* of the firearm." *Id.* at 143. But even short of an attempt to shoot, Gruber's acute connection with his firearm was light years away from the "inert presence" the *Bailey* court faced — having a gun locked in the trunk of a car or inside a locked footlocker in a bedroom. *Id.* at 149. Beyond doubt it was not "storage" (the Court's synonym for "the nonactive nature of this asserted 'use'"). *Id.* at 149. It was dramatically more than placement for later active use. It was more than a display for intimidation, which *Bailey* considers a "use." *Id.* at 148-49. It was part of the assault.

The jury was correctly told an assault is an attempt to inflict injury coupled with an apparent ability to do so.[6] The jury apparently considered the assault on

---

[6] The district court may have unduly increased the government's burden of proof. The instructions defined forcible assault as "any deliberate and intentional attempt or threat to inflict physical injury upon another with force or strength when that attempt or threat is coupled with an apparent ability to do so." (R. Vol. 1, Doc. 38 at 22.) With respect to a different, but similar, assault statute we recently concluded "that recklessness is a culpable mens rea with respect to assault resulting in serious bodily injury under [18 U.S.C.] § 113(a)(6)." *United States v. Zunie*, 444 F.3d 1230, 1233 (10th Cir. 2006).

Overby complete when Gruber reached for his weapon. Without more, the weapon was "used" during the assault. But there was more. Gruber grabbed the weapon and removed it from his waistband — a patent "use."

The evidence — not considered in "bits and pieces" but as a whole, *Wilson*, 107 F.3d at 778 (quotations omitted) — demonstrated an active use of a firearm by Gruber sufficient to affirm the jury's verdict. I dissent from the reversal and remand. However, I join the majority opinion affirming the other aspects of the district court's judgment and sentence.