# United States Court of Appeals

## For the Eighth Circuit

———————————————

No. 14-3717

———————————————

Greater Missouri Medical Pro-Care Providers, Inc.

*Plaintiff - Appellant*

v.

Thomas E. Perez; United States Department of Labor; Administrator; Wage and Hour Division

*Defendants - Appellees*

—————————

Appeal from United States District Court
for the Western District of Missouri - Joplin

—————————

Submitted: September 22, 2015
Filed: December 14, 2015

—————————

Before RILEY, Chief Judge, BYE and GRUENDER, Circuit Judges.

—————————

RILEY, Chief Judge.

Greater Missouri Medical Pro-Care Providers, Inc. (GMM) provides physical and occupational therapists to serve in hospitals, nursing homes, and similar facilities. GMM appeals the district court's decision to uphold a final decision and order of the United States Department of Labor (DOL) Administrative Review Board (ARB) that found GMM violated several provisions of the Immigration and Nationality Act

(INA), 8 U.S.C. § 1101 et seq., relating to the H-1B visa[1] program, and awarded damages and interest to some GMM workers. Having jurisdiction under 28 U.S.C. § 1291, we reverse.

## I. BACKGROUND

GMM hired physical and occupational therapists from the Philippines through the H-1B program for temporary foreign workers. As part of the H-1B process, GMM filed numerous labor condition applications (LCAs) with the Secretary of Labor (Secretary) for the workers GMM wanted to hire. In the LCAs, GMM agreed to provide prescribed wages and working conditions for its H-1B employees. See 8 U.S.C. § 1182(n)(1)(D); 20 C.F.R. §§ 655.730-.733.

The INA and the implementing regulations require H-1B employers like GMM to pay certain wages when an H-1B employee becomes "available for work or otherwise comes under the control of the employer, such as by waiting for an assignment, reporting for orientation or training, going to an interview or meeting with a customer, or studying for a licensing examination." 20 C.F.R. § 655.731(c)(6)(i); see also 8 U.S.C. § 1182(n)(1)(A)(i)(II). Employers must pay prescribed wages to employees in a "nonproductive status due to a decision by the employer (e.g., because of lack of assigned work), lack of a permit or license, or any other [unexcepted] reason," 20 C.F.R. § 655.731(c)(7)(i)—a decision referred to as "benching"—and cannot require employees to pay for the employer's attorney fees, costs, or other business expenses incurred filing LCAs and H-1B petitions, 8 U.S.C. § 1182(n)(2)(C)(vi)(II); 20 C.F.R. § 655.731(c)(9)(ii), (iii)(C). And an employer may not impose a penalty for early termination but, under certain conditions, may receive

---

[1]The H-1B visa takes its name from 8 U.S.C. § 1101(a)(15)(H)(i)(b), which defines a class of non-immigrant alien workers eligible to work in the United States temporarily to perform services in "specialty occupations."

"bona fide liquidated damages" from an H-1B employee who leaves employment before an agreed upon date. 20 C.F.R. § 655.731(c)(10)(i)(A), (B).

Under 8 U.S.C. § 1182(n)(1), the Secretary reviews the LCAs an H-1B employer has filed "only for completeness and obvious inaccuracies" and, in the absence of any such deficiencies, must certify the LCA within seven days of filing.[2] Thus, the INA generally does not permit the Secretary to challenge the employer's attestations in an LCA, nor does the INA otherwise contemplate a comprehensive pre-certification review. See id. § 1182(n). Instead, the INA generally provides four situations for initiating an investigation of potential violations: (1) investigations based on a complaint from an "aggrieved person or organization," id. § 1182(n)(2)(A); (2) "case-by-case . . . random investigations" of an employer within five years of a prior willful violation, id. § 1182(n)(2)(F); (3) investigations where the Secretary "personally certif[ies]" he "has reasonable cause to believe that the employer is not in compliance with [subsection (n)]," id. § 1182(n)(2)(G)(i); and (4) investigations based on "specific credible information" of a willful violation of certain requirements from a reliable source, id. § 1182(n)(2)(G)(ii).

On June 22, 2006, Alena Gay Arat, one of GMM's H-1B therapists from the Philippines, filed a complaint with Missouri state regulators alleging GMM had violated several H-1B requirements. Specifically, Arat alleged she paid all of the fees to file and extend her H-1B visa, including attorney fees. Arat complained, "My Employer . . . made me and the rest of us (therapist) [sic] stay[] in a company-paid apartment to review for [a licensing exam] and during that non-productive period, my employer just gave US$50.00 per week for food allowance." Noting she arrived in the United States on February 21, 2005, but did not work until May 6, 2005, Arat

---

[2]Although the Secretary has delegated the authority to investigate and enforce the H-1B program requirements to the Administrator of the Wage and Hour Division, see 20 C.F.R. §§ 655.715, 655.800(a), we refer to the Secretary as used in 8 U.S.C. § 1182(n).

alleged GMM did not pay her promised salary until Arat passed the exam and obtained her license. Arat also questioned whether the fee GMM proposed to recover for "breach of contract" upon Arat's early termination of her employment contract was legal.

The state regulators forwarded Arat's complaint to the DOL, which treated it as an "aggrieved party" complaint. See 8 U.S.C. § 1182(n)(2)(A). After reviewing the complaint, DOL investigator Erica Simon concluded the Secretary had "reasonable cause" to investigate the charge that GMM "[r]equired or attempted to require [Arat to pay] a penalty for ceasing" her employment early. Simon initiated an investigation on July 18, 2006, later explaining that date was "when we knew we had a potentially valid complaint, something that we would have a reasonable cause to move forward with." In accordance with the DOL's standard practice for all H-1B investigations, Simon initiated a "full investigation under the H-1B provisions of the IMA [sic]" "to see if there [we]re violations to any employee during [the relevant] time period."

On August 4, 2006, Simon sent GMM a "standard" DOL form letter notifying GMM it had "been scheduled for investigation under [the H-1B LCA] provisions" and, per the Secretary's standard practice, requesting all of GMM's H-1B documents and records, including LCAs for all of GMM's H-1B employees. Based on the sole allegation that GMM improperly attempted to collect an early termination penalty from Arat, the Secretary demanded sixteen different subcategories of evidence related to GMM's H-1B program and its H-1B employees. The Secretary's request for information did not mention Arat's allegations or otherwise indicate the Secretary's comprehensive investigation was based on an aggrieved-party complaint. In addition to obtaining GMM's payroll and other records, Simon interviewed Arat and other H-1B workers as well as representatives of GMM.

Based on Simon's investigation, the Secretary decided GMM violated the INA. Among other things, the Secretary concluded GMM (1) improperly failed to pay

-4-

required wages to employees GMM had placed in nonproductive status, including employees studying to obtain occupational licenses; (2) made improper deductions from employee wages for attorney and H-1B petition fees; and (3) "required or attempted to require" improper penalty payments for early termination from some employees. The Secretary ordered GMM to pay $372,897.93 in back wages to forty-four employees—later amended to $382,889.87 to forty-five employees.

GMM timely requested a hearing before an administrative law judge (ALJ), and GMM and the Secretary filed cross-motions for summary judgment. Among other things, GMM argued "[t]he applicable statute and regulation limit an aggrieved-party complaint to the specific issues of the Complaint and to the aggrieved party's LCA." On October 23, 2009, the ALJ granted partial judgment to the Secretary, opining "[n]othing in the [INA] or its implementing regulations supports GMM's theory that the [Secretary] is limited in investigatory power to a specific complainant and his or her complaints." The ALJ decided the Secretary's broad investigation of GMM was within his statutory and regulatory authority.

The ALJ also rejected GMM's argument that "[t]he applicable statute and regulation impose a 12-month time limit for investigating violations outside of twelve months prior to the filing of a complaint." The ALJ reasoned, "While it is true that an aggrieved party must file a complaint within one year of the last violation or misrepresentation, the regulations make clear that this is a jurisdictional bar only to the filing of a complaint, and it does not limit the scope of remedies." Deciding there were "no genuine issues of material fact" as to whether GMM failed to pay required wages to some employees during nonproductive employment and made improper deductions from employee wages, the ALJ granted judgment to the Secretary on those issues and set a hearing to consider "[a]dditional proof regarding which H-1B employees were affected by" GMM's violations and the proper remedies for those violations. The ALJ also determined GMM illegally withheld some employees' paychecks.

After the hearing, the ALJ issued a decision ordering GMM to pay (1) $338,042.19 of back wages to forty employees for benching violations; (2) $8,160.00 to seventeen employees for illegal fee deductions; and (3) $8,284.23 to four employees for illegally withholding paychecks. The ALJ also awarded pre- and post-judgment interest on the awards. The ALJ ultimately did not find GMM had attempted to collect an improper penalty from Arat—the sole allegation that prompted the Secretary's comprehensive review of GMM's H-1B practices.

GMM petitioned the ARB for review, which affirmed in part and reversed in part over a partial dissent by one board member. Like the ALJ, the ARB decided the Secretary's aggrieved-party complaint investigation was not limited to timely allegations in the complaint. "Based on the plain language of the statute and regulations, [ARB] precedent, and a broad reading of the relevant legislative and regulatory history," the ARB held "that the [Secretary] had the authority to investigate alleged INA violations involving H-1B workers who did not file complaints." The ARB also affirmed the ALJ's interest award. However, the ARB reversed "the ALJ's finding that discrete violations occurring outside a twelve-month period prior to the filing of a complaint are actionable." Upholding the award of back pay as a remedy for violations that continued into the relevant twelve-month period, the ARB reduced the award for benching violations to $106,785.85.

The dissent agreed with the ARB's decision to uphold Arat's award and acknowledged the Secretary's discretionary authority to expand an aggrieved-party investigation under other statutory and regulatory provisions. But the dissent would have reversed the rest of the award because the dissent agreed with GMM that the Secretary's investigation into matters outside the complaint exceeded the Secretary's authority under § 1182(n)(2)(A). The dissent first disputed the suggestions in the ARB decision that (1) Arat's complaint alleged INA violations involving other GMM employees, and (2) the Secretary's investigation into other possible violations was based on information Arat provided. The dissent found Arat's allegations, when taken

-6-

in context, were clearly exclusive to her.  In light of what the dissent saw as Arat's focus on herself, the dissent concluded the Secretary had no authority under § 1182(n)(2)(A) to expand the aggrieved-party investigation to include all of GMM's H-1B employees because the Secretary "independently obtained" the information about other potential violations "during the course of its investigation into Arat's complaint."

In contrast to the broad investigatory powers the ARB authorized under the aggrieved-party provisions, the dissent determined the INA required that if the Secretary received credible information of other potential violations in the course of an existing investigation, the Secretary should expand the inquiry by initiating a credible-information/reliable-source investigation under § 1182(n)(2)(G)(ii) and 20 C.F.R. § 655.807.  Because the Secretary did not comply with the requirements in those provisions when investigating GMM for violations toward employees other than Arat, the dissent reasoned any award based on the results of this expanded investigation exceeded the Secretary's authority.

GMM appealed the ARB's decision to the district court pursuant to its right of review under the Administrative Procedure Act (APA).  See 5 U.S.C. § 702.  On cross-motions for summary judgment, the district court upheld the award based on what it viewed as the Secretary's reasonable interpretation of § 1182(n)(2)(A). Noting GMM did not dispute the violations, the district court agreed with the ARB that Arat's complaint sufficiently alleged INA violations as to other GMM H-1B employees during the relevant time period and the Secretary's investigation was within the authority granted by § 1182(n)(2)(A).  The district court also affirmed the award of interest.  GMM appeals.

## II.   DISCUSSION
### A.   Standard of Review

We review de novo the district court's determination that the ARB's order did not violate the APA.  See McClung v. Paul, 788 F.3d 822, 828 (8th Cir. 2015).  We

also "review de novo a district court's findings and conclusions regarding the correctness of an agency's statutory interpretations." Harmon Indus., Inc. v. Browner, 191 F.3d 894, 897 (8th Cir. 1999).  We must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.

Section 706 further provides, in part, that we shall

(2) hold unlawful and set aside agency action, findings, and conclusions found to be–

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> (B) contrary to constitutional right, power, privilege, or immunity;

> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> (D) without observance of procedure required by law; [or]

> (E) unsupported by substantial evidence.

**B.      Limited Scope of an Initial Aggrieved-Party Complaint Investigation**
This appeal requires us to consider the proper scope of the Secretary's initial investigation in response to an aggrieved-party complaint under § 1182(n)(2)(A). "We begin with the statute's language."  Muscarello v. United States, 524 U.S. 125, 127 (1998).  "And where the statutory language provides a clear answer, [we] end[] there as well."  Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999); accord Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). "[W]hen deciding whether the language is plain, we must read the words '"in their

context and with a view to their place in the overall statutory scheme.'"'" King v. Burwell, 576 U.S. ___, ___, 135 S. Ct. 2480, 2489 (2015) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)).

By its terms, § 1182(n)(2)(A) requires the Secretary to

> establish a process for the receipt, investigation, and disposition of complaints respecting [an employer's] failure to meet a condition specified in an [LCA] or [an employer's] misrepresentation of material facts in such an application. . . . No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

The Secretary has taken an extremely broad view of his authority under § 1182(n)(2)(A).

Taking the twelve-month time limitation first, we note that in urging the ARB to affirm the damage award for discrete violations that occurred before the twelve-month period specified in § 1182(n)(2)(A), the Secretary argued the statutory and regulatory requirements were met as long as just one claim fell within the twelve-month period. The ARB rejected the Secretary's expansive interpretation, deciding "[t]he plain meaning of the[] statutory and regulatory provisions dictate [sic] a finding that any LCA violations which occurred more than a year before Arat filed her complaint are not actionable" under § 1182(n)(2)(A). The Secretary does not challenge that sensible conclusion on appeal.

The Secretary's view of his substantive authority to investigate an aggrieved-party complaint under § 1182(n)(2)(A) is just as broad. As the Secretary sees it, a finding of reasonable cause to investigate just one allegation by an aggrieved party

automatically justifies a comprehensive investigation of the employer as a whole and "authorize[s] DOL to inquire into other LCAs and the employer's statutory [and regulatory] compliance with the [H-1B] program in general." That is, reasonable cause to investigate any single violation alleged by an aggrieved party "establishes a reasonable cause to investigate the employer" and every action the employer has taken with respect to the H-1B program and its H-1B employees.[3] The breadth of the Secretary's interpretation is evidenced by Simon's testimony that the Secretary's standard practice is to conduct a "full investigation" "[e]very time" the DOL does "an investigation of any sort under H1-B," "to determine if any violations exist under H1-B" and "to see if there are violations to any employee during" the relevant time period.

The Secretary's expansive understanding of his investigatory authority is inconsistent with the plain language and structure of § 1182(n). The Secretary speaks of "reasonable cause to investigate the employer" and the employer's overall compliance with the H-1B program, but § 1182(n)(2)(A) does not grant the Secretary authority to investigate in those terms. Rather than authorize an open-ended investigation of the employer and its general compliance without regard to the actual allegations in the aggrieved-party complaint, § 1182(n)(2)(A) expressly ties the Secretary's initial investigatory authority to the complaint and those specific allegations "respecting [an employer's alleged] failure to meet a condition specified in an [LCA] or [an employer's] misrepresentation of material facts in such an [LCA]" for which the Secretary finds "reasonable cause to believe" the employer committed the alleged violation. See also 20 C.F.R. § 655.806(a)(2) ("The [aggrieved-party] complaint shall set forth sufficient facts for the [Secretary] to determine whether there is reasonable cause to believe that a violation as described in § 655.805 has been

_____

[3]The Secretary asserts in his brief, "The statute makes an aggrieved party complaint a sufficient condition for initiating an investigation, . . . [and] nothing limits DOL's ability to inquire into the employer's statutory compliance in general." We disagree.

-10-

committed, and therefore that an investigation is warranted."). Read naturally, the Secretary's authority to conduct an initial investigation under § 1182(n)(2)(A) is based upon the Secretary finding reasonable cause to believe the employer's specific misconduct as alleged in the complaint violates the INA.[4]  That reasonable-cause finding limits the scope of the initial investigation.

To illustrate the discord between the statutory text and the Secretary's broad interpretation, we must look no further than the alternative avenues of investigation in § 1182(n)(2). First consider § 1182(n)(2)(F). In contrast to § 1182(n)(2)(A)'s limited focus on the particular misconduct alleged in the complaint, § 1182(n)(2)(F) authorizes the Secretary, "on a case-by-case basis, [to] subject an *employer* [who has willfully violated the statute] to random investigations for a period of up to 5 years" and clarifies "[t]he authority of the Secretary under this subparagraph shall not be construed to be subject to, or *limited by*, the requirements of subparagraph (A)." (Emphasis added). Similarly, § 1182(n)(2)(G)(i) authorizes the Secretary to investigate "any [H-1B] *employer* . . . if the Secretary . . . has reasonable cause to believe that the *employer* is not in compliance with this subsection," provided the Secretary "personally certif[ies] that reasonable cause exists and . . . approve[s] commencement of the investigation." (Emphasis added).

Had Congress intended to authorize (1) a comprehensive investigation of the *employer* in § 1182(n)(2)(A) based on a single allegation in an aggrieved-party complaint like it did in § 1182(n)(2)(F) based on past violations, or (2) a general compliance review of the *employer* like it did in § 1182(n)(2)(G)(i), "Congress could

---

[4]We do not question the Secretary's determination that an aggrieved party can raise allegations on behalf of others, either individually or by class, but that conclusion does not alter the proper scope of the Secretary's initial aggrieved-party complaint investigation, which still depends on the allegations in the complaint and the Secretary's reasonable-cause determination whether "such a failure or misrepresentation has occurred." 8 U.S.C. § 1182(n)(2)(A).

easily have said so." Kucana v. Holder, 558 U.S. 233, 248 (2010). It did not. Indeed, the Secretary's current standard practice has the practical effect of converting every aggrieved-party complaint into a comprehensive compliance review without the procedural safeguards of § 1182(n)(2)(G)(i). Neither the plain language of the statute nor reason permits that practice.

Ignoring what Congress has actually said, the Secretary proposes "[t]he statute is silent on the scope of [the Secretary]'s authority to investigate aggrieved party complaints," leaving "a gap for the agency to fill." See Chevron, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). But § 1182(n)(2)(A) is not silent on the scope of the Secretary's investigation. While the statute does empower the Secretary to "establish a process for the receipt, investigation, and disposition of [aggrieved-party] complaints," the statute does not grant the Secretary unlimited discretion to investigate such complaints and authorize the comprehensive initial investigation of the employer and its general compliance that the Secretary currently conducts in every case regardless of the allegations in the complaint. Id. Put simply, § 1182(n)(2)(A) authorizes the Secretary to investigate aggrieved-party complaints, yet the Secretary claims authority to investigate far more. The Secretary's initial authority to investigate an aggrieved-party complaint is unambiguously limited by the plain meaning of § 1182(n)(2)(A) to those timely allegations in the complaint for which the Secretary has found reasonable cause to investigate.

We recognize additional violations may come to light during a lawfully initiated and properly limited aggrieved-party complaint investigation, and the Secretary may be right that it could become necessary to modify or expand such an investigation as it develops—presumably based on reasonable cause. See id. § 1182(n)(2) (requiring reasonable cause to investigate in the absence of prior willful violations). But we need not address those issues here because that is not what happened in this case. The

Secretary's comprehensive initial investigation of GMM pursuant to the Secretary's standard practice exceeded his statutory authority from the outset. Simon testified the only allegation in Arat's aggrieved-party complaint for which she found reasonable cause to investigate was the charge that GMM may have required Arat to pay an improper penalty for early termination. Based on that single allegation and despite her very narrow reasonable cause determination, Simon—asserting the expansive investigatory authority under § 1182(n)(2)(A) that the Secretary has claimed throughout this case—launched a comprehensive review of GMM, its general H-1B compliance, and all of its H-1B employees. Section 1182(n)(2)(A) did not authorize such a sweeping investigation.

We also are not persuaded by the Secretary's plea that enforcing the plain textual limitation on the Secretary's initial aggrieved-party complaint investigation will somehow force the Secretary to "ignore" "violations in addition to those alleged by the aggrieved party" that the Secretary discovers "through an inspection of the employer's documents." Although we offer no opinion on the Secretary's authority to investigate potential violations discovered in the course of a properly limited aggrieved-party complaint investigation and, to borrow the ARB's language, do not pretend to "dictate the exact contours of" an aggrieved-party investigation, we are satisfied our decision does not require the Secretary to ignore other potential violations it discovers in the course of a lawful investigation.

Indeed, § 1182(n) and the supporting regulations authorize several alternative avenues of investigation. First, information from additional aggrieved parties could provide the basis for additional complaints and investigations. Section 1182(n)(2)(B) contemplates "similar [aggrieved-party] complaints respecting the same" employer and permits the Secretary to consolidate the hearings for those claims. Next, as noted above, § 1182(n)(2)(G)(i) permits the Secretary to initiate a compliance review of the type the Secretary conducted here, provided the Secretary "personally certif[ies] that reasonable cause exists" and approves the investigation. Finally, as examined by the

ARB dissent, § 1182(n)(2)(G)(ii) and 20 C.F.R. § 655.807 authorize the Secretary to investigate certain types of alleged violations when the Secretary receives credible information about such violations from a reliable source, which could include information discovered in the course of a lawful DOL investigation.

Under § 1182(n)(2)(G)(ii), the Secretary has authority to investigate if he

receives specific credible information from a source who is likely to have knowledge of an employer's practices or employment conditions, or an employer's compliance with the employer's [LCA], and whose identity is known to the Secretary of Labor, and such information provides reasonable cause to believe that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees.

Clause (iv) provides

Any investigation initiated or approved by the Secretary of Labor under clause (ii) shall be based on information that satisfies the requirements of such clause and that

(I) originates from a source other than an officer or employee of the Department of Labor; or

(II) was *lawfully obtained by the Secretary of Labor in the course of lawfully conducting another Department of Labor investigation* under this chapter o[r] any other Act.

Id. § 1182(n)(2)(G)(iv) (emphasis added) (footnote omitted).

The Secretary asserts § 1182(n)(2)(G)(ii) does not apply to an aggrieved-party complaint investigation, maintaining there is "no reason to read the statute to bifurcate

-14-

th[e] investigation process simply because [the Secretary] come[s] across additional information during the course of a lawfully conducted [and] lawfully initiated investigation." But the Secretary fails to explain why information obtained during an aggrieved-party complaint investigation is necessarily excluded from § 1182(n)(2)(G)(iv)(II) despite the statutory language there expressly stating information obtained during another DOL investigation can constitute credible information from a reliable source. That § 1182(n)(2)(G)(iv)(II) also might apply in other circumstances does not preclude its application when credible information about additional violations is obtained during an aggrieved-party complaint investigation.

GMM, on the other hand, asserts "§ 1182(n)(2)(G)(ii)-(iv) and the regulations applicable to [a] credible information-reliable source investigation" stand at the ready to provide "the very authority needed" to expand an ongoing aggrieved-party complaint investigation and permit the Secretary to consider any additional "information as to other possible violations or other employees" the Secretary might uncover in the course of such an investigation. According to GMM, by enacting § 1182(n)(2)(G)(ii)-(iv), "Congress set forth a clear process applicable when an investigation reveals information beyond the original investigation's scope."

GMM may be right to a point, but closer examination of the statute reveals § 1182(n)(2)(G)(ii) would not necessarily cover all of the potential H-1B violations the Secretary might discover during an aggrieved-party complaint investigation. Section 1182(n)(2)(G)(ii) applies to an employer's (1) willful failures to meet certain conditions; (2) "pattern or practice of failures to meet such a condition"; and (3) "substantial failure to meet such a condition that affects multiple employees." This subsection—which may apply to certain violations, but not others—is not the clear and all-inclusive path of expansion GMM proposes.

At any rate, we need not determine the applicability of § 1182(n)(2)(G)(ii), if any, to this case, nor examine the contours of the Secretary's extensive investigation into GMM's general H-1B compliance and all its H-1B employees. We need only compare the sweeping scope of the Secretary's initial aggrieved-party complaint investigation with the narrow finding of reasonable cause to investigate just one personal allegation in Arat's complaint to see the Secretary exceeded his statutory authority in this case from the beginning. See id. § 1182(n)(2)(A); cf. United States v. Morton Salt Co., 338 U.S. 632, 652 (1950) ("Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power.").

Because the ARB's findings of violations and the resulting awards were based entirely on the Secretary's unauthorized investigation of matters other than the allegation GMM penalized Arat for quitting before her contract ran out, the awards cannot stand.

## III.  CONCLUSION

We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

———————————————————